EUGENE BIRT *v.* ST. MARY MERCY HOSPITAL OF GARY, INC. ET AL.

[No. 3-1074A171. Filed December 6,1977.]

*John Kappos, Hawk P. C. Kautz*, of Merrillville, *Daniel C. Kuz-man*, of Merrillville, for appellant.

*James V. Donadio, Margaret C. Attridge, Ice Miller Donadio & Ryan*, of Indianapolis, *Patrick J. Galvin, W. Patrick Downes, Galvin, Galvin & Leeney*, of Hammond, *T. Clifford Fleming, Lucas, Clifford, Kane & Holcomb*, of Merrillville, for appellees.

GARRARD, J. — Plaintiff, Eugene Birt, appeals from a summary judgment granted in favor of individual non-treating defendant physicians on Birt's claim for malpractice. These individuals were associated with the treating physician in a medical professional corporation organized under the Indiana Medical Professional Corporation Act (hereinafter: IMPCA), IC 1971, 23-1-14-1 *et seq.* (Burns Code Ed.). We affirm.

Prior to March 17, 1972, Dr. M. Valencia (Valencia) and Doctors J. Sala, W. Sala, W. Nowlin, R. Purcell, A. Williams, F. Monroe, T. Lorenty, and F. Spellman (Appellee Physicians) agreed to operate and staff the emergency room of St. Mary Mercy Hospital of Gary (Hospital). On March 17, 1972, Valencia and Appellee Physicians, all being duly licensed in Indiana, executed articles of incorporation under the IMPCA for Mercy Medical Associates, Inc. (Associates). The doctors became stockholders, directors and employees of Associates. On April 6, 1972, the Secretary of State

certified and approved Associates' articles of incorporation. On April 9, 1972, Valencia and Appellee Physicians began staffing Hospital's emergency room. All emergency room physician fees were collected by the hospital and paid to Associates. Associates paid its physician employees an hourly wage.

On May 13, 1972, Birt was treated at the emergency room by Valencia, the scheduled attending physician. As of that date Associates had not received from the State Board of Medical Registration and Examination[1] (Board) a certificate of registration as required by IC 1971, 23-1-14-8.[2]

Subsequently, Birt filed an action alleging malpractice by Valencia. The hospital, Associates, Valencia, and Appellee Physicians were all named defendants. Appellee Physicians subsequently moved for summary judgment. The trial court found the following facts to be uncontested in addition to those summarized above: that *none* of the Appellee Physicians were present at the hospital, nor on duty, nor scheduled to be on duty when Birt was treated; that *none* of the Appellee Physicians advised Valencia on the treatment or diagnosis of Birt; that Appellee Physicians exercised *no* control over and had *no* right to direct the treatment of Birt; that *none* of the Appellee Physicians stood in the relationship of physician-patient to Birt at any relevant time; and that Appellee Physicians' *sole* connection with Valencia was through Associates.

The trial court concluded as a matter of law that on the date of Birt's treatment Associates had achieved *de jure* incorporation under the IMPCA and that under that act, a stockholder, director, officer, or employee of a medical professional corporation is not personally liable for the tort of a physician employee *merely* because of corporate association. On appeal, Birt challenged both conclusions.

---

1. The Board of Medical Registration and Examination was abolished and its powers transferred to the Medical Licensing Board by Acts 1975, P.L. 271, § 4. *See* IC 1971, 25-22.5-2-1 *et seq.* (Burns Supp. 1976).

2. The Board had granted Associates tentative approval but withheld final certification because Associates had neglected to supply a copy of its by-laws.

Birt argues that the certificate of registration required by IC 1971, 23-1-14-8 is a *sine qua non* for corporate existence under the IMPCA. Associates lacked such a certification when Birt was treated. Therefore, it is said, the liability of Appellee Physicians is not determined by the IMPCA. We disagree.

IC 1971, 23-1-14-5 provides:

"Applicability of the Indiana General Corporation Act.—Part I and II [23-1-1-1—23-1-10-6] and sections 70 and 71 [23-1-12-1, 23-1-12-2] of the Indiana General Corporation Act, Acts 1959 [1929], chapter 215, as amended and supplemented, shall be applicable to professional corporations, *including their organization* and they shall enjoy the powers and privileges and be subject to the duties, restrictions and liabilities of other corporations, except where inconsistent with the provisions and purpose of this act [23-1-14-1—23-1-14-21]. This act shall take precedence in the event of any conflict with provisions of the Indiana General Corporation Act." (emphasis added)

IC 1971, 23-1-3-4 (Burns Code Ed.) of the General Corporation Act states:

"Effect of certificate of incorporation.—Upon the issuance of the certificate of incorporation by the secretary of state, *the corporate existence shall begin*, all subscriptions for shares theretofore received shall be deemed accepted by the corporation *and the subscribers for such shares, or their assigns, shall be deemed to be shareholders of the corporation.*

The certificate of incorporation issued by the secretary of state shall be conclusive evidence of the fact that the corporation has been incorporated; but proceedings may be instituted by the state to dissolve, wind up and terminate a corporation which should not have been formed under this act or which has begun business without a substantial compliance with the conditions prescribed by this act as precedent to beginning business." (emphasis added)

Accordingly, absent a conflict with the provisions or purposes of the IMPCA, IC 1971, 23-1-3-4 would declare Associates to have begun corporate existence on April 6, 1972 when its articles of incorporation were certified and approved by the Secretary of State. Birt, however, alleges that such a conflict exists between

IC 1971, 23-1-3-4 and IC 1971, 23-1-14-8 which provides:

> "Certificate of registration.—*No corporation incorporated under this act* [23-1-14-1 — 23-1-14-21] shall open, operate or maintain an establishment for any of the purposes set forth in section 6 [23-1-14-6] of this act without a certificate of registration from the regulating board. Application for such registration shall be made to said board in writing and shall contain the name and address *of the corporation* and such other information as may be required by the board. Upon receipt of such application, the board shall make an investigation *of the corporation.* If the board finds that the *incorporators, officers, directors and shareholders* are each licensed pursuant to the Medical Practice Act [25-22-1-1 et seq.; Burns' §§ 63-1301 et seq.] and if no disciplinary action is pending before the board against any of them, and if it appears that *the corporation* will be conducted in compliance with the law and regulations of the board, the board shall issue, upon payment of a registration fee of $10.00, a certificate of registration which shall remain effective until January 1st following the date of such registration." (emphasis added)

We do not believe the statutory language supports the construction that compliance with its provisions is a condition precedent to corporate existence. It refers to a "corporation *incorporated* under this act" and to its "incorporators, officers, directors and shareholders." Thus, the statute contemplates an existing corporate entity. Moreover, the context of the statute is to require Board certification before any medical professional corporation "shall open, operate, or maintain an establishment" to render medical service. This strongly indicates that certification is a condition precedent for the *doing of business* instead of a condition to valid incorporation. Such a construction is supported by the decision in *Western Machine Works, et al. v. Edwards Machine and Tool Corp., et al.* (1945), 223 Ind. 655, 63 N.E.2d 535. In that case, our Supreme Court construed a section of the General Corporation Act which provided in part:

> "A corporation formed under this act shall not transact any business or incur any indebtedness, except such as shall be incidental to its organization or to obtaining subscriptions to or payment for shares of its capital stock, until; * * * (b) The amount of paid-in capital with which it will begin business, as

stated in the articles of incorporation, has been fully paid in."
223 Ind. 655, 662, 63 N.E.2d 535, 538.

Relying in part upon the predecessor to IC 1971, 23-1-3-4 and, in
part, upon the statutory language referring to an existing cor-
porate entity, the Court held the requirement of paid-in capital to
be a condition for doing business rather than for valid incorpora-
tion.

The purposes of the IMPCA as stated in IC 1971, 23-1-14-2, do
not require that we reject this plain meaning of IC 1971, 23-1-14-8
in favor of the construction advocated by Birt. It might be said
that his interpretation would marginally increase the protection
of the public from frauds and incompetents seeking to operate
through a medical professional corporation. However, the
primary purpose of the act, as discussed, *infra*, is not the protec-
tion of the public from the illicit medical practitioner; that pur-
pose is served by other statutes and administrative rules govern-
ing the practice of medicine. The statutory scheme is merely to
preseve the effectiveness of those controls. Accordingly, we find
the trial court did not err in determining that Associates was a
medical professional corporation when Birt was treated.

We now turn to the issue of whether the trial court correctly
found Appellee Physicians not to be personally liable as a matter
of law for Valencia's malpractice.

As noted above, the General Corporation Act controls medical
professional corporations absent a conflict with the purposes or
provisions of the IMPCA. IC 1971, 23-1-14-5. Thus, the
act discloses legislative intent that the common law
which supplements statutory corporations law shall also
apply to medical professional corporations.

By statute, stockholder liability for corporate debts is limited
to the extent of unpaid subscriptions or promised consideration
for issues shares. IC 1971, 23-1-2-6(g). Under common
law, a corporate stockholder, director, agent, or
employee is not personally liable for the torts of the cor-
poration, or of another agent, *merely* because of his office or

holdings; some additional connection with the tort is required.[3] *Hartzler, et al. v. Goshen Churn & Ladder Co.* (1914), 55 Ind. App. 455, 471, 104 N.E. 34, 40; 6 I.L.E., *Corporations*, § 157, p. 563; 3A Fletcher Cyclopedia *Corporations*, Ch. 11, § 1137, p. 207; and 19 Am. Jur. 2d *Corporations*, §§ 714 and 1382.

Is this general rule contrary to the provisions or purposes of IMPCA? To answer that question it is helpful to review the considerations which spawned the act.

Certain treasury regulations, commonly known as the "Kintner Regulations," require business associations to have certain corporate characteristics before they may qualify under the Internal Revenue Code for the favorable tax treatment accorded to corporate pension and profit sharing programs.[4] These corporate characteristics are: (a) continuity of life, (b) centralized management, (c) limited liability, and (d) free transferability of ownership interest. However, the Internal Revenue Service added that the attributes of an association were to be determined by state law. The effect was to largely preclude groups of professionals operating under the Uniform Partnership Act from acquiring the desirable "corporate" status. In response many states, including Indiana, passed legislation designed to enable professionals to form tax-favored corporations. *See* Lyon, *Action in Indiana on Kintner-Type Organizations*, 39 Taxes 266 (1961); *Kurzner v. U.S.* (5th Cir., 1969), 413 F.2d 97; Annot., 4 A.L.R. 3d 383.[5]

Under the regulations in effect when the IMPCA was promulgated, limited liability was not a special precondition to achieving "corporate" status. It was simply one of the four factors to be considered. *Kurzner, supra; Petition of Bar Ass'n. of Hawaii* (S. Ct. Hawaii, 1973), 516 P. 2d 1267. Even so, the IMPCA's

---

3. No argument is presented regarding liability of corporate officers. We therefore do not consider that issue.

4. In *U.S. v. Kintner* (9th Cir., 1954), 216 F.2d 418, an association of physicians was entitled to the benefit which is afforded to corporations with pension and profit sharing programs.

5. Professional service organizations organized and operated under IMPCA and Indiana's other professional corporation statutes have been ruled by the Internal Revenue Service as qualifying for treatment as a corporation for federal income tax purposes. Rev. Rul. 70-101.

restrictions on the free transferability of ownership set forth in IC 1971, 23-1-14-10, make the existence of limited liability more crucial if the main legislative purpose of qualification is to be given effect. *Cf.* The Regional Rail Reorganization Act cases where the Court gave effect to the general purpose of the statute over the purpose of one of its subparts.[6]

We turn then to the express language of our statute. IC 1971, 23-1-14-14 provides:

> "This act does not modify any law applicable to the *relationship between* a *person furnishing* professional medical service *and* a *person receiving* such service, *including liability arising out of such* professional service." (emphasis added)

It is, thus, apparent that our legislature intended that the IMPCA should not destroy the traditional relationship between a professional and his patient through the creation of a corporate shield. *See* Lyon, *supra;* Mow, *Professional Ass'ns. and Professional Corps.*, 16 S.W. L.J. 462. It has been argued that such provisions must be construed to preserve more than the personal liability of a corporate employee for his own negligent tort existing under general corporations law. We agree. However, it does not necessarily follow that the statute imports the vicarious liability of the Uniform Partnership Act to apply to associating physicians. Without deciding, we note that the statute may impose personal liability on contracts to cure and liability for the negligence of assistants acting under the physician's direction. *See* Comment, *Professional Corps. and Ass'ns.*, 75 Harv. L. Rev. 776.

In view of the provision that general corporation law applies except where contrary to the provisions or purpose of the IMPCA,[7] vicarious liability due *solely* to association would appear

---

6. The question was whether claims for compensation could be made under the Tucker Act, 28 USCA § 1491. Congressional debate disclosed an intent to limit financial obligations of the government to those specified in the Reorganization Act, 45 USCA § 741, *et seq. See Connecticut Gen. Ins. Corp. v. United States Ry. Assn.* (E.D. Pa. 1974), 383 F. Supp. 510. This, however, jeopardized the constitutionality of the act upon a basis unforeseen by the Congress. When interpretation of the statute reached the Supreme Court, the act was upheld. *Blanchette v. Connecticut Gen. Ins. Corp.* (1974), 419 U.S. 102, 95 S. Ct. 335, 42 L.Ed.2d 320.

7. IC 1971, 23-1-14-5.

to be beyond the purview of the explicit terms of IC 1971, 23-1-14-14, which retains relationship and liability between "a person furnishing" and "a person receiving" professional medical service. *See O'Neill v. U.S.* (N.D. Ohio 1968), 281 F. Supp. 359, *aff'd.* (6th Cir., 1969), 410 F.2d 888; Vesely, *The Ohio Professional Corp. Law*, 13 Western Reserve L. Rev. 195.

At least one commentator has suggested that vicarious liability is necessary to protect patient expectations that an entire firm will be engaged in his behalf rather than merely the associate with whom he deals.[8] It appears to us that this overstates the case. While a patient may well expect to have the organization's entire expertise *available* to him, experience dictates that the physician-patient relationship is generally intensely personal, rather than collective.

Apprehension has also been expressed concerning the ability of an injured patient to collect a damage award without the existence of vicarious liability. Again, however, we believe the fear is overstated. Of course, the malpracticing physician is liable to the extent of his personal assets and such malpractice insurance as he, or the corporation may possess. In addition, it is beyond question that the corporate entity is liable for malpractice committed by one of its members. *See, e.g., Lemhart v. Toledo Urology Associates, Inc.* (1975), 48 Ohio App. 2d 249, 356 N.E.2d 749; *Zimmerman v. Hogg & Allen* (1974), 22 N.C. App. 544, 207 S.E. 2d 267, *rev. on other grounds* 209 S.E. 2d 795.

Finally, it has been said that vicarious liability among associating professionals is necessary to insure the proper quality of services provided by professional corporations. However, the continuing supervision of professional status under the act [IC 1971, 23-1-14-8, 10, 13, 15 and 16] and the penalties available for violations of professional ethics take most of the force from this argument. Even if broad forms of liability are desirable, a rule other than vicarious liability should be adequate. *See* Note,

---

8. *See* Bittker, *Professional Ass'ns. and Federal Income Taxation: Some Questions and Comments*, 17 Tax L. Rev. 1; Bittker, *Professional Service Organizations: A Critique of the Literature*, 23 Tax L. Rev. 429.

*Professional Corps.*: *Analysis under the Tax Reform Act and a Survey of State Statutes*, 58 Georgetown L.J. 489.

In addition we note that the rule of vicarious liability does not appear to have been imposed, historically, as a matter of public policy to guard against the effects of malpractice. The ancient prohibition against the practice of learned professions by corporations was primarily to prevent a *lay* intermediary from interfering with or controlling professional relationships, judgments and ethics. *See* Wilcox, *Hospitals and the Corporate Practice of Medicine*, 45 Cornell L. Q. 432. Under this doctrine physicians and other professionals desiring to associate in practice were essential limited to the device of partnership and its attendant rule of vicarious liability. Vicarious liability, however, was not limited to professionals. It is an effect of the rule, applicable to all general partnerships, that each partner is the agent of the others. *See* 60 Am. Jur. 2d, *Partnership*, § 162. The rule of mutual agency, in turn, was an outgrowth of "aggregate theory" of partnership under common law which refused recognition of the partnership as an entity distinct from its members. Barrett & Seago, *Partners and Partnerships*, pp. 153, 400-401. This is reflected in the early case of *Hess v. Lowery* (1889), 122 Ind. 225, 226-27, 23 N.E. 156, where our Supreme Court stated:

> "That each partner is the agent of the firm while engaged in the prosecution of the partnership business, and that the firm is liable for the torts of each, if committed within the scope of his agency, appears to be well settled. It follows from the principles of agency, coupled with the doctrine that each partner is the agent of the firm, for the purpose of carrying on its business in the usual way, that an ordinary partnership is liable in damages for the negligence of any one of its members in conducting the business of the partnership. Thus in *Ilyrne v. Erwin*, 23 S.C. 226 (55 Am. Rep. 15), which was an action against two physicians for an injury resulting from the negligent and unskilful setting of a broken arm, it was held that the act of one, within the scope of the partnership business, was the act of each and all, as fully as if each was present participating in all that was done, and that each partner guarantees that the one in charge shall display reasonable care, diligence and skill, and that the failure of one is the failure of all." [citations omitted]

Appellant urges, however, that the results of this analysis should be altered by an order of our Supreme Court, effective April 10, 1970, which appears as an appendix to the General Professional Corporation Act, IC 1971, 23-1-13-1 *et seq.*[9] That order prescribes requirements for *lawyers* forming professional service corporations. Subparagraph (c) provides:

> "Incorporation by two or more lawyers associated in the practice shall not modify any law applicable to the relationship between the person or persons furnishing professional services and the person receiving such service, including but not limited thereto, privileged communications which bind all associated, *as well as the liability of each for all, arising out of the professional services offered by one lawyer associated with others in the same corporation, as existed in a partnership for the practice of law.*"

However, the order was not issued as an opinion on a matter in litigation, or as a formal advisory opinion. *See, e.g., In re Public Laws 305 and 309* (1975), 263 Ind. 506, 334 N.E.2d 659. These facts together with the subsequent superseding of the order by disciplinary rule persuade us that the Supreme Court was not then construing the statute in its capacity of judicial tribunal. Instead, we believe it was exercising its constitutional authority to promulgate administrative regulation of the practice of law. Constitution of Indiana, Art. 7, § 4. Acting in its administrative capacity the Supreme Court was not bound, as we are here, to the specific terms of the statute. It was empowered to give effect to the legal profession's unwavering commitment to the interests of the client in regulating the practice of law. It necessarily follows that the order does not dispose of the question with which we are presented.[10]

---

9. The order was superseded by Admission and Discipline Rule 27 effective January 1, 1976, amended August 31, 1976. The rule very closely parallels the original order.

10. We express no opinion as to whether the Medical Licensing Board has authority to issue similar regulation of the medical profession under IC 1971, 23-1-14-15. *Cf.* IC 1971, 23-1-13.5-5 (Burns 1976 Supp.) empowering the State Board of Public Accountancy to promulgate regulations providing for joint liability among incorporating accountants, and the exercise of that power in Board of Accountancy Rule 31 (23-1-13.5-3)-3, Burns Admin. Rules and Regs. (1976 Ed.).

The IMPCA manifests legislative intent that medical professional corporations be imbued with as many of the attributes of general corporations as may be, without destroying the traditional professional relationship between physician and patient. We conclude that neither the express language of the statute, nor the qualification purpose of maintaining strong professional relationships require importation of the partnership doctrine of vicarious liability into the professional corporate arena. Plainly general corporate concepts preclude it. Accordingly we hold that no vicarious liability arises solely from association under the IMPCA.

The judgment of the trial court is affirmed.

Staton, P.J. and Hoffman, J. concur.

NOTE—Reported at 370 N.E.2d 379.