In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 15-3037 & 15-3048

ACF 2006 CORP.,

*Plaintiff-Appellee,*

*v.*

MARK C. LADENDORF, ATTORNEY AT LAW, P.C., and TIMOTHY F. DEVEREUX,

*Defendants-Appellants,*

*and*

DAVID L. BEALS, SR., *et al.*,

*Intervening Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-01286-TWP-DML — **Tanya Walton Pratt**, *Judge.*

———————

ARGUED APRIL 13, 2016 — DECIDED JUNE 23, 2016

———————

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Attorney William F. Conour stole more than $4.5 million from clients' trust funds, was convicted of fraud, and is serving ten years in prison. Shortly

before these crimes came to light, attorney Timothy Devereux left Conour Law Firm, LLC, and took 21 clients with him to Mark Ladendorf's law firm. These clients ultimately produced attorneys' fees aggregating some $2 million. This appeal presents a three-corner fight about who gets how much of that money. The contestants are Devereux and the Ladendorf Firm (collectively the Lawyers), several persons from whom Conour stole (collectively the Victims), and ACF 2006 (the Lender), whose parent corporation Advocate Capital, Inc., made a loan to the Conour Firm to finance the legal work and out-of-pocket expenses that a contingent-fee law firm must bear while suits are in progress.

There are two principal questions. First, how much of the $2 million goes to the Conour Firm for the services it performed before Devereux left? Second, how are the funds to which the Conour Firm is entitled to be divided between the Victims and the Lender? After a bench trial, the district court concluded that the Conour Firm is entitled to some $775,000 under principles of *quantum meruit*. 2015 U.S. Dist. LEXIS 112772 (S.D. Ind. Aug. 25, 2015). The judge also decided that the Lender has priority over the Victims. 2015 U.S. Dist. LEXIS 10942 (S.D. Ind. Jan. 30, 2015), reconsideration denied 2015 U.S. Dist. LEXIS 21709 (S.D. Ind. Feb. 24, 2015). We start with the Lawyers' appeal, because it determines how much is available for division between the Victims and the Lender.

In Indiana, as in other states, clients may discharge their lawyers for any reason. If newly hired counsel pursues the case to a successful conclusion, the original lawyer is entitled to be paid for the value of the work done. See *Galanis v. Lyons & Truitt*, 715 N.E.2d 858, 861 (Ind. 1999). That's the doctrine of *quantum meruit*. At the bench trial, the parties con-

tested the value of the different lawyers' contributions to 11 of the 21 cases that Devereux took from the Conour Firm to the Ladendorf Firm. Only two cases remain in dispute. The parties refer to them by initials: L.B. and R.S.

L.B. was a products-liability suit arising from the failure of a gear puller and the severe injury that the failure caused. Whether the gear puller was defective was the principal dispute. If so, L.B. stood to receive a substantial award (with a potential contest about how much); if not, L.B. would receive nothing. The Conour Firm filed a complaint, served standard interrogatories, and hired an expert who examined the location of the accident but could not perform scientific tests on the gear puller until the defendant turned it over, which happened at 5 p.m. on the day before Devereux moved from the Conour Firm to the Ladendorf Firm. On the same day, the defendant took two-hour depositions of two witnesses.

The real work of discovery began with testing, which occurred on the Ladendorf Firm's watch and revealed that the gear puller's metal was brittle because it had been exposed to hydrogen during manufacture. That scientific analysis (embodied in the expert's report) was followed by more discovery (including a deposition of the defense expert) and a settlement for $3.550 million on the eve of trial. The Ladendorf Firm had prepared a detailed trial plan and had more than 70 exhibits and 21 witnesses ready to go. The plaintiff's contingent-fee contract with the Ladendorf Firm entitled it to almost $1.4 million in fees, plus about $40,000 in costs.

The district court concluded that the Conour Firm gets 40% of this $1.4 million, plus its own expenses of $3,000, for a total of roughly $600,000. The court gave a one-sentence explanation: "This is based upon the fact that the Conour

Firm engaged in discovery, hired an investigator to interview witnesses, took two depositions, inspected the facility, obtained the defective part at issue, began developing the destructive testing protocol, and prepared the settlement statement and the demand letter." 2015 U.S. Dist. LEXIS 112772 at *24. What the judge did not explain is why the Conour Firm's work, though valuable to the client, was anywhere close to 40% of either the effort expended or the value provided. The bulk of the work—both the scientific analysis and the legal time—was performed by the Ladendorf Firm after the gear puller became available for testing.

Three witnesses at trial put the value of the Conour Firm's work at 10% of the total. No one testified differently. If we use expenses as a proxy for work done, the Ladendorf Firm could have claimed a larger share. (It incurred $40,000 of the $43,000 total expenses, or 93%.) Any estimate of the value of legal work is bound to be imprecise. Still, the fact that three witnesses chose 90% without contradiction (the Lender did not present a legal expert's analysis of the relative value of the two law firms' work) provides a starting point. Yet the district court did not mention that estimate or justify the 40% ratio it chose. And the Lender does not defend it substantively. Instead the Lender relies entirely on the standard of appellate review.

Appellate review of findings in a bench trial is deferential, see Fed. R. Civ. P. 52(a)(6), and the answer to "who provided what part of the value?" is a proposition of fact. Still, Rule 52(a) allows a court of appeals to reverse a finding when the court has a definite and firm conviction that a mistake has been made. See *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *United States v. United States Gypsum Co.*, 333

U.S. 364, 395 (1948). We have such a conviction with respect to the allocation of fees for the L.B. matter. The Lender has not argued that it is entitled to a new trial if we disagree with the district court's findings. Because the Lender has not attempted to justify any ratio *other* than 40%, we order the award reduced to 10% (roughly $140,000 plus $3,000 in expenses).

The R.S. case was another products-liability matter, settled for a total of $520,000. One defendant paid $20,000 while the Conour Firm was handling the case, and the remaining defendants paid $500,000 after Devereux moved to the Ladendorf Firm. The Ladendorf Firm received a contingent fee of $200,000, or 40% of the $500,000 collected while it had the case. The district court found that the Conour Firm is entitled to 60% of that $200,000, or $120,000. 2015 U.S. Dist. LEXIS 112772 at *22–24.

That allocation seems generous to the Ladendorf Firm, because the judge found that the Conour Firm did essentially all of the work and that the case settled promptly after Devereux moved to the Ladendorf Firm. Nonetheless the Lawyers tell us that 60% is too high—that, indeed, the Conour Firm should get nothing. This is not because of any estimate of the amount of work done; the Lawyers concede that almost all of the legal work occurred while Devereux was at the Conour Firm. Instead the Lawyers insist that the Conour Firm should be docked for damaging the plaintiff's prospects in two ways: (a) accepting only $20,000 from one defendant, and (b) not paying all of the expert witness's invoice. (The Conour Firm told R.S. that it was holding on to the entire $20,000 to cover costs already incurred, but apparently some of that money found its way to Conour's pocket.)

Although the Lawyers assert that settling with one de-
fendant for $20,000 decreased the total recoveries obtainable
from the case, they do not explain how. Damages would
have been joint and several; other defendants remained lia-
ble (if liable at all) for the full injury. As for the failure to pay
the expert's entire bill: the Ladendorf Firm didn't pay either,
and Devereux testified that he had decided that an expert
was unnecessary. Whether either or both firms stiffed the
expert would be important in a suit by the expert seeking
full compensation, or a demand by R.S. for some of the
$20,000 that the Conour Firm kept, but it does not affect how
the $200,000 fee should be divided between the two law
firms.

The Lawyers raise one more issue. The district court add-
ed 8% prejudgment interest to the award. 2015 U.S. Dist.
LEXIS 112772 at *31–32. The Lawyers maintain that this is in-
appropriate because all of the disputed fees had been held in
an IOLTA account pending the district court's decision.
IOLTA stands for interest on lawyers' trust account, and in
Indiana that interest must be paid to groups that will use the
money to secure legal representation for those who cannot
afford it. Ind. R. Prof. Conduct 1.15(f). The Lawyers contend
that they should not be required to pay prejudgment interest
when they did not receive any interest to begin with. Interest
is compensation for the time value of money and is therefore
part of complete compensation. See *West Virginia v. United
States*, 479 U.S. 305, 310 & n.2 (1987); *In re Oil Spill by the
Amoco Cadiz off the Coast of France on March 16, 1978*, 954 F.2d
1279, 1331–37 (7th Cir. 1992). But if a given pot of money has
no time value (at least to law firms), then there is nothing to
apportion between the parties—no reason why the Conour

Firm should be compensated for delay in payment when the Ladendorf Firm is not.

Indiana law appears to support the Lawyers' position. *Kummerer v. Marshall*, 971 N.E.2d 198, 202 (Ind. App. 2012). Once again, the Lender has chosen not to engage on the merits. Its brief does not discuss *Kummerer* or otherwise defend the substance of the district court's decision. Instead the Lender contends that the Lawyers waived this point by not calling it to the district judge's attention.

The Lawyers have a good reason for this, however: The Lender never asked for prejudgment interest. The court added interest unbidden (*sua sponte* as lawyers like to say). The Lawyers might have filed a motion to amend the judgment under Fed. R. Civ. P. 59(e), but the opportunity to file such a motion is an option rather than a command. A litigant is never required to remonstrate with the judge (to take an exception) once a decision has been made. Fed. R. Civ. P. 46. It is enough to present one's views on contested issues before the decision is made. As neither the Lender nor the Victims requested prejudgment interest, the Lawyers had no reason to think that this was an open issue and therefore were not obliged to address the subject before the judge issued her decision. The award of prejudgment interest was a misstep that must be undone on remand.

It follows from this discussion that the Lawyers owe the Conour Firm less than the current value of the Conour Firm's indebtedness to the Lender—and substantially less than what Conour owes to the Victims. The outcome thus turns on priority between the Lender and the Victims; one or the other will receive everything the Lawyers must disgorge.

Advocate Capital made a loan in 2008 and filed a financing statement under the Uniform Commercial Code. Its lien dates to that year. (The transfer from Advocate to ACF does not affect priority.) The Victims did not get a judgment against Conour, either directly or via the restitution awarded in the criminal prosecution, until 2014. It follows, the district court held, that the Lender has priority under the UCC. 2015 U.S. Dist. LEXIS 10942 at *14–30.

The Victims contend that Ind. Code §30-4-3-22 gives them priority as the victims of a breach of trust. The district court rejected this argument on the ground that neither the legal theory nor the statute had been identified in the Victims' complaint. 2015 U.S. Dist. LEXIS 10942 at *29–30; 2015 U.S. Dist. LEXIS 21709 at *5–6. That is not a satisfactory reason. Complaints plead *claims*, which is to say grievances. The Victims' grievance was stated, as Fed. R. Civ. P. 8 contemplates, plainly and without unnecessary detail: Their trust funds were plundered, and they want recompense. The reasons why they believe that they have priority over the Lenders need not be pleaded, because complaints need not cite authority or set out a line of legal argument. See, e.g., *Johnson v. Shelby*, 135 S. Ct. 346 (2014); *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073 (7th Cir. 1992). The Victims have a single claim for relief; multiple legal theories in support of that claim differ from multiple claims that must be separately pleaded. See, e.g., *Frank v. Walker*, 819 F.3d 384, 387–88 (7th Cir. 2016). Making legal arguments in support of one's claim comes after the pleadings. The Victims raised Ind. Code §30-4-3-22 at the right time, and in the right way.

The district court concluded, in the alternative, that §30-4-3-22 does not support the Victims to the extent they seek

relief against funds held by the Conour Firm, as opposed to Conour personally. 2015 U.S. Dist. LEXIS 21709 at *7–9. That conclusion has more support.

If a trustee wrongfully removes money (or other property) from a trust, Ind. Code §30-4-3-22(b) and (c)(1) provide ways for the court to order the assets returned. But the Victims are not trying to retrieve what Conour took or funds that can be traced to his theft. The money generated by the Lawyers has never been held in trust for the Victims and is unrelated to Conour's crimes. The Victims therefore must rely on §30-4-3-22(c)(2), which provides for situations in which the trust's assets "cannot be traced and identified":

> (A) In a case of commingling of funds or property, the beneficiary is entitled to a lien against the trustee's individual property from the date and in the amount of the fund or the value of the property at the time of the commingling.

> (B) In a case of conversion of property, the beneficiary is entitled to a lien against the trustee's individual property from the date and according to the value of the property at the time of the conversion.

Conour converted the Victims' trust funds before Advocate Capital made its loan, so if the Victims have a lien under this statute it comes ahead of the Lender's interest. But the district court thought that the Victims lose because subparagraphs (A) and (B) both say that the lien is "against the trustee's individual property". Funds held by the Conour Firm, or to which the Conour Firm becomes entitled, are not William Conour's "individual property". Nor was the Conour Firm the trustee; William Conour was trustee of all client funds held in trust, so "individual property" refers to Conour's personal property.

Conour had (and may still have) an interest *in* the Conour Firm as a member of the limited liability company, but Conour and the LLC are distinct entities. (The Victims have not argued that Indiana's standards for veil-piercing are satisfied.) It was the LLC, not Conour, that employed Devereux and borrowed money from Advocate Capital. The Victims have not asked the court to transfer to them the value of Conour's membership interest in the LLC, which does not appear to have any monetary value (and, if it does, may have been seized already to provide restitution in the criminal prosecution). Instead the Victims want the benefit of funds that the Lawyers owe to the Conour Firm, and §30-4-3-22(c)(2) does not create such a remedy. Not directly, anyway. Not without the aid of another statute.

The Conour Firm is a professional-services business, which in Indiana is subject to a rule that the use of a corporate form does not change the relation between lawyer (or physician) and client. The Victims rely on Ind. Code §23-1.5-2-7:

> (a) The relationship between an individual performing professional services as an employee of a professional corporation and a client or patient is the same as if the individual performed such services as a sole practitioner.

> (b) The relationship between a professional corporation performing professional services and the client or patient is the same as between the client or patient and the individual performing the services.

If William Conour had operated his law practice as a proprietorship or partnership, then under §30-4-3-22(c)(2) all of its assets would be available to aggrieved clients, and a claim based on a breach of trust would come ahead of a lender's interest if the breach predated the loan. Section 23-1.5-2-7

tells us that the client has the same rights vis-à-vis a professional corporation as it does against a solo practitioner—and one of those rights is to recompense for breach of trust.

As far as we can tell, Indiana's judiciary has yet to consider the effect of §23-1.5-2-7 in the 36 years since its enactment, though it did say that the law's predecessor was designed to prevent the corporate form from changing the traditional relation between a professional and a client or patient. See *Birt v. St. Mary Mercy Hospital of Gary, Inc.*, 175 Ind. App. 32, 39–43 (1977). That seems to give the Victims the upper hand in their contest with the Lender. We can imagine some possible responses. Perhaps Indiana's legislature meant the word "corporation" literally, so that a lawyer who arranges for his assets to come to an LLC avoids the application of §23-1.5-2-7. Perhaps something about the relation between §30-4-3-22(c)(2) and §23-1.5-2-7 means that the former trumps the latter. Neither of these possibilities seems likely. But we don't have to decide because, continuing a pattern of refusing to engage on the merits, the Lender does not make either argument. Indeed, the Lender's brief does not cite §23-1.5-2-7 or consider the possibility that assets of a professional LLC are imputed to the lawyer (or the professional debts of a lawyer imputed to the LLC) for the purpose of statutes such as §30-4-3-22(c)(2).

The norm that victims of a lawyer's breach of trust have a remedy notwithstanding the later grant of a security interest to a commercial lender is one of long standing and is reflected in Indiana by §30-4-3-22(c)(2). Section 23-1.5-2-7 tells us that the use of the corporate form to hold assets of a legal practice does not change that norm. It follows that the Vic-

tims have priority over the Lender in the funds that the Conour Firm is entitled to receive from the Lawyers.

The judgment of the district court is reversed, and the case is remanded for the entry of judgment consistent with this opinion.