**In re Robin Richard MILLS, Debtor.**

**SHAVER MOTORS, INC., Plaintiff,**

v.

**Robin Richard MILLS, Defendant.**

**Bankruptcy No. 86–62184.**
**Adv. No. 87–6027.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary.

Dec. 29, 1988.

Steve Tokarski, Merrillville, Ind., for plaintiff.

William Hill, Lansing, Ill., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGEMENT

KENT LINDQUIST, Chief Judge.

### I

#### Statement of Proceedings

This adversary proceeding came on for a bench trial on September 27, 1988 pursuant to Order of Court of August 10, 1988.

A Pre–Trial Order was entered on January 19, 1988, and pre-trial statements were filed by the Defendant on February 8, 1988, and by the Plaintiff on March 15, 1988, as amended September 19, 1988.

Shaver Motors, Inc.'s (hereinafter: "Plaintiff") complaint filed February 23, 1987 alleges that the Debtor, Robin Richard Mills (hereinafter: "Defendant") is indebted to it in the sum of $31,000 based on a state court default judgment versus the Debtor, and that said debt is nondischargeable in the Defendant's Chapter 7 Bankruptcy pursuant to § 523(a)(4) and (6), in that the Defendant willfully and maliciously converted the Plaintiff's 1981 Replica Auburn Convertible Automobile to his own use by having it shipped outside of the United States to the State of Bahrain, sold the same and converted the proceeds thereof to his own use.

Submitted. Evidence and arguments heard.

At the conclusion of the trial, the Plaintiff was ordered to file its verified statement of any and all payments received by it relating to the lease of the Auburn to the Defendant from all sources, and the Defendant was granted 10 days from the date of service thereof to object thereto.

On October 21, 1988, pursuant to Order of this Court, the Plaintiff filed its post-trial affidavit averring that the total gross amount of monies received by the Plaintiff from the Defendant as to the vehicle in question was $8,131.74.

### II

#### Findings of Fact

Ronald Shaver (hereinafter: "Shaver"), President of the Plaintiff, testified that he was introduced to the Defendant who advised Shaver that he wanted to manufacture replicas of Auburns, and ship the same to potential customers in the Middle East for sale.

Shaver further related that the Defendant advised that Automotive Legends, Inc. (hereinafter: "Automotive"), of which the Defendant was President, owned two prototype Auburns which were security for a loan to the Automotive by a Bank.

Shaver stated that he agreed on behalf of the Plaintiff to pay off the Bank, take title to the two Auburns and in turn lease them back to Automotive. The certificates of origin were assigned by Automotive to the Plaintiff, but for some unknown reason they were never actually titled in the name of the Plaintiff (Plaintiff's Group Exhibit No. 2). The only vehicle in dispute is the Auburn, Serial No. 813305 (hereinafter: "Auburn 305")

The Plaintiff physically inspected both Auburns, paid off in full the liens on both Auburns held by the Bank, and in turn leased both vehicles as lessor to Automotive as lessee with the Defendant as signatory therein as President of Automotive. The Defendant did not sign the lease in his individual capacity. No option to purchase was given by the Plaintiff in the leases.

The Lease as to the Auburn 305 was executed on November 2, 1982 ("lease"), and provided, among other things as follows:

1. That the Auburn 305 would be used for business or commercial purposes as a "show car" and that the lessee was a corporation.

2. That the lessee would use or permit use of the Auburn only within the continental limits of the United States. (Clause 5)

3. That lessee would return the Auburn at the end of the lease term or upon termination of the lease. (Clauses 7 and 9)

4. Automotive acknowledged that during the lease term it had no title, equity, property right or interest in the Auburn. (Clause 12)

5. Automotive agreed not to assign, transfer, sublet, or lease its rights under the lease and to not pledge, mortgage, or otherwise encumber the vehicle. (Clause 13)

The lease was for a 36 month term ending November 2, 1985 with monthly installments of $948.10, the total lease payments being $34,131.60.

In preparing the lease, Shaver related he used a car invoice/data worksheet dated November 2, 1982, which had attached thereto a handwritten invoice which he received from the Defendant showing dealer cost to be $43,711.23 and the manufacturer's listed price to be $52,500.00 (Plaintiff's Group Exhibit No. 3).

Shaver showed the acquisition cost to the Plaintiff as $22,500.00 as this was the amount paid to the Bank by the Plaintiff for the release of the lien thereon, and the transfer of the vehicle from Automotive to it.

Shaver stated he had no discussions or arrangements with Automotive through the Defendant as to any sale of the Auburn 305, that he never received any request by Automotive or the Defendant to remove the vehicle from the United States and/or sell it, and never expressly or impliedly consented to such a transaction.

Shaver declared that early in the lease term, Automotive went in default on the lease, and in August of 1983, a formal demand was made for the Auburn 305, but the same was never returned. Although the Defendant advised Shaver the vehicle was in various places in Indiana, the Plaintiff could never locate the same. Finally, the Defendant was located in Illinois, and on September 27, 1983, the Plaintiff filed suit in Illinois for replevin of the Auburn 305 and damages. Shaver never got the Auburn 305 back, and the Defendant advised Plaintiff's counsel that it had been sold in the State of Bahrain.

Shaver stated that through inquiries by his Illinois counsel with the U.S. Department of Commerce, the U.S. Consular Service, and the shipper of the vehicle, his counsel around October, 1984, received a copy of a commercial invoice dated March 4, 1983, which stated that the vehicle had been sold to one Khalil Hijris (hereinafter: "Hijris") for 15,000 Derum. According to Shaver, the invoice was received with a cover letter from the Department of Commerce, and other supporting documents from the Consular Service, which were not admitted into evidence. The invoice is purportedly signed by the Defendant as President of Automotive, and as seller of the vehicle. (Plaintiff's Exhibit no. 4). The document was purportedly witnessed by one W.K. Glynn.

The Defendant objected to the admission of said invoice copy into evidence on the grounds it was a forgery and not authentic. The Court reserved its ruling on the objection.

Shaver was of the opinion that the Defendant's signature was annexed to the invoice having seen his signatures previously on the lease.

Shaver declared that depreciation as to the vehicle over the lease term would be 70% of the acquisition cost of the vehicle of $22,500.00 and, with normal wear and tear, that the residual value thereof at the end of the lease would be $6,675.00. Based on the Plaintiff's depreciation schedule, the book value of the Auburn 305 based on $22,500.00 acquisition cost was approximately $19,157.00 when allegedly sold to Hijris March 4, 1983, in that since the vehicle was a replica rather than a true antique it did not increase in market value, but rather was subject to depreciation. He stated the Plaintiff's portion cash flow generated by the lease was $153.86 per month based on a monthly payment of $794.24 made by the Plaintiff.

The Defendant testified he was the President as well as a stockholder and Director of Automotive from June of 1982 until December of 1983 when it ceased all operations.

The Defendant stated that at the suggestion of some officials of the City of Anderson Economic Development Commission, from whom Automotive obtained a loan for $184,000 to set up a plant, there was an "informal" director's meeting of Automotive held, and it was decided without objection by any Director to ship the Auburn 305 to United Arab Emirates (hereinafter: "U.A.E.") late in January, 1983 in order to generate sales to potential customers in the Middle East. The Defendant flew separately to U.A.E. and was in U.A.E. when the vehicle arrived there. Glynn handled all the shipping arrangements per the Defendant.

According to the Defendant, the vehicle was shown at two car shows in U.A.E., and put in storage pending shipment back to the U.S.A. At this time, the Defendant avers he met Hijris, and after obtaining references favorable to him, the Defendant entered into an agency agreement with Hijris for him to represent Automotive in the Middle East by showing (not selling) the Auburn 305 in the hopes of generating sales to Middle East customers by Automotive. No evidence was submitted as to whether this agency agreement was oral or in writing.

The Defendant stated that he gave the physical possession of the vehicle, a copy of the Bill of Lading as to the vehicle which reflected the vehicle I.D. Number and the equipment on the vehicle, and the key to Hijris, returned to the United States around February 18, 1983, and never saw the vehicle again. He further asserts he was in the United States on March 4, 1983, the date of the invoice purporting to sell the Auburn, which purportedly contains his signature as President of Automotive as seller. Although the Defendant asserts he made many efforts to obtain the vehicle back between April of 1983 and December of 1983, he was unsuccessful, and Hijris has consistently refused to respond to inquiries or provide information regarding the disposition of the vehicle.

The Defendant freely admits that the signature on the invoice could well be his, but that the invoice itself that contains the signature is not authentic, had to have been "doctored" by Hijris and was "lifted" by using other blank Automotive stationary he had given Hijris combined with copies made of his signature from some other document. He noted that the Automotive stationary has a dark blue band across the top thereof which copies clearly, but there is no such band shown on the invoice. The Defendant declared that alleged witness to the invoice, Glynn, cannot be found, but that the signature of Glynn looks like his, and that he was Vice-president and Secretary/Treasurer of Automotive as of the date of the alleged invoice.

The Defendant asserted he never gave custody of the vehicle to Hijris to sell, as the Auburn was only a prototype, and was only to be used for show purposes to generate orders to manufacture and sell like vehicles. He stated the value of the vehicle was around $44,000 to $45,000, and a sale price of 15,000 Derum would only be around $4,000.00 in American Dollars.

The Defendant acknowledged that he did not get prior authorization of the Plaintiff to ship the vehicle out of the United States, and asserted he did not read the lease as to

its terms prohibiting the same before he executed it.

## III

### *Conclusions of Law and Discussion*

■ The legal paragraph one of the Plaintiff's complaint alleges that the indebtedness of the Defendant to the Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) which provides that a discharge under § 727 does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

Discharge clearly cannot be denied based on § 523(a)(4). There was no showing of an express or technical trust established by agreement or statute prior to the wrongful acts complained of. *See, Miller et. al. v. Krause*, Adv. No. 86–6032 (*In re Krause*, Case No. 85–61962) (unpub. opin. J. Lindquist, Sept. 9, 1988); *Leeb v. Guy* (*In re Guy*), 101 B.R. 961 (Bankr.N.D.Ind.1988).

Neither does the conduct of the Defendant constitute "larceny" or "embezzlement" pursuant to § 523(a)(4). Larceny was not committed as the original possession by the Defendant was lawful, nor was there any evidence that the Defendant wrongfully appropriated the proceeds of the purported sale to his own use, after the vehicle was initially legally entrusted to him, which would be the property of another, i.e. the Plaintiff. *See Phytotec, Inc. v. Mark*, Adv. No. 84–4008 (*In re Mark*, Case No. 83–40599) (unpub. opin., J. Lindquist, March 24, 1986).

The issue remains as to whether the Defendant's conduct constituted "willful and malicious" injury to the property of the Plaintiff pursuant to § 523(a)(6) as alleged in legal paragraph two of the Plaintiff's complaint.

11 U.S.C. § 523(a)(6) provides as follows:
(a) a discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt.—

\*   \*   \*   \*   \*   \*

(6) For willful and malicious injury by the Debtor to another entity or to the property of another entity.

The legislative history to this provision must be carefully scrutinized regarding this provision. The House Report is as follows:

Paragraph (6) excepts debts for willful injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754, 11 Am.Bankr. Rep. 568 (1902) ], held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.

H.R.Rep. 95–595, 95th Cong., 1st Sess. 365 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, 6320; Reprinted in 4 *Norton Bankruptcy Law and Practice, Legislative History*, § 523, p. 404 (Callaghan & Co. 1983).

The legislative statements to this section add the following comment:

Section 523(a)(6) adopts the position taken in the House bill and rejects the alternative suggested in the Senate amendment. *The phrase "willful and malicious injury" covers a willful and malicious conversion.*

124 Cong.Rec., H11096 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978); Reprinted in 4 *Norton Bankruptcy Law and Practice, Legislative History*, § 523, pp. 404–405 (Callaghan & Co. 1983). (Emphasis added).

The Supreme Court in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), provided a definition of "malicious injury". *Tinker* involved a state court action against a bankrupt for damages arising from criminal conversation with the plaintiff's wife. At issue was whether the bankrupt's acts were willful and malicious injury to the plaintiff's property rights, and thus nondischargeable under Section 17(a)(2) of the Bankruptcy Act of 1898.[1]

---

**1.** See 11 U.S.C. § 35(a)(2), repealed 1978. Sec-

tion 17(a)(2) is the predecessor provision under

The Supreme Court in *Tinker* for the purposes of Section 17(a)(2) concluded:

[W]e think a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* at 487, 24 S.Ct. at 509, 48 L.Ed. 754.

The legislative history of the Bankruptcy Code reflects that Congress clearly intended a standard of intentional and deliberate conduct, and not merely a willful disregard or reckless conduct.

*Collier on Bankruptcy* has made a helpful analysis of § 523(a)(6) as follows:

In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury. It has been said that this category of liabilities excepted from discharge "contemplates something more restricted than malice in the broader sense," and covers all cases in which the facts of intent and malice are judicially ascertained, irrespective of the character of the allegations made by the parties. Injuries within the meaning of the exception are not confined to physical damage or destruction; but an injury to intangible personal or property rights is sufficient. *Thus the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is willful and malicious injury within the meaning of the exception. On the other hand; a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge.*

A claim or judgment based merely upon negligence does not necessarily constitute a willful and malicious injury within the exception even if the negligence is alleged to be reckless and wanton. Under this paragraph, "willful" means deliberate or intentional. Cases decided under section 17a(2) of the former Bankruptcy Act, such as *Tinker* to apply a "reckless disregard" standard, they are overruled. In *Greenfield v. Tuccillo,* [129 F.2d 854 (2d Cir.1942)] the Second Circuit Court of Appeals said, citing *Tinker:*

The question is whether the liability to Greenfield was for "willful and malicious" injuries. Such injuries have been defined by the Supreme Court as arising from an act involving a "willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally." *Tinker v. Colwell,* 193 U.S. 473, 487 [24 S.Ct. 505, 509, 48 L.Ed. 754], 11 AM.B.R. 568. *See, McIntyre v. Kavanaugh,* 242 U.S. 138 [37 S.Ct. 38, 61 L.Ed. 205], 38 AM.B.R. 165; *Brown v. Garey,* 28 AM.B.R. (N.S.) 270, 267 N.Y. 167, 169 [196 N.E. 12].…

It is clear from both the House and Senate Reports that the standard of "reckless disregard" as expressed in *Greenfield* will no longer be applicable, and the many cases holding various degrees of recklessness to constitute willfulness and maliciousness will no longer be controlling in construing section 523(a)(6) of the Code.

3 *Collier on Bankruptcy,* 523.16 (pp. 511–14) (L.King 15th Ed.) (Footnotes omitted).

The formulation and application of a precise definition of "willful and malicious" to be applied generally has been a difficult one for the courts.

the Bankruptcy Act of 1898 to § 523(a)(6) of the Code.

The definition of "willful" has given the courts the least problem, and most courts have followed the legislative history and have held that "willful" means a deliberate or intentional act. *See, In re Adams,* 761 F.2d 1422, 1426 (9th Cir.1985); *In re Held,* 734 F.2d 628 (11th Cir.1984); *In re Clark,* 50 B.R. 122, 126 (Bankr.D.N.D.1985); *In re Nuckols,* 47 B.R. 731, 734 (Bankr.E.D.Va. 1985); *In re Langer,* 12 B.R. 957, 959 (D.N. D.1981).

Thus "willful and malicious" does not mean reckless disregard or mere negligence. *In re Compos,* 768 F.2d 1155, 1157 (10th Cir.1985); *In re Louis,* 49 B.R. 135, 137 (Bankr.E.D.Wis.1985); *In re Nuckols,* 47 B.R. 731, 734, *supra, Matter of Vereen,* 43 B.R. 489, 491 (Bankr.M.D.Fla.1984).

However, as pointed out by the court in the recent case of *In re Cecchini,* 780 F.2d 1440, 1442 (9th Cir.1986), the courts are split over the interpretation of the phrase "willful and malicious" even though the act must be found to be intentional. The word "malicious" is less susceptible to precise definition, and has always been a difficult concept for the court to apply. That is, as *Cecchini* points out, some courts have found this phrase requires an intentional act which *results* in injury, *see, e.g. In re DeRosa,* 20 B.R. 307, 313 (Bankr.S.D.N.Y. 1982); *In re Fussell,* 15 B.R. 1016, 1022 (W.D.Va.1981); *In re McGiboney,* 8 B.R. 987, 989 (Bankr.N.D.Ala.1981), while other courts have found that phrase requires an act with the *intent to cause injury. See, e.g., In re Finnie,* 10 B.R. 262, 264 (Bankr. D.Mass.1981); *In re Hinkle,* 9 B.R. 283, 286 (Bankr.D.Mass.1981); *In re Graham,* 7 B.R. 5 (Bankr.D.Nev.1980).

The plaintiff in *Cecchini* urged that the looser standard of "willful and malicious" refers to an intentional act which causes injury. Under this construction the creditor would not be required to prove that the debtor acted with intent to injure, i.e. actual or specific malice and that implied or constructive indicia is sufficient. The *Cecchini* court noted that the plaintiff's construction was in accord with other circuits that recently addressed the matter. *Cecchini,* 780 F.2d at 1442, *citing In re*

*Franklin,* 726 F.2d 606, 610 (10th Cir. 1984); *In re Held,* 734 F.2d 628, 629–30 (11th Cir.1984); *Matter of Quezada,* 718 F.2d 121, 123 (5th Cir.1983); *Seven Elves, Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983). *Accord: Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257 (11th Cir.1988); *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir. 1987); *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003 (4th Cir.1985). *See also, In re Adams,* 761 F.2d 1422, 1427 *supra.* There the court rejected the appellant's contention that the requirements of willfulness and malice could only be satisfied by a showing that he specifically intended to injure the appellee.

Accordingly, *Cecchini* holds that when a wrongful act, such as conversion is done intentionally, necessarily produces harm, and is without just cause or excuse, it is "willful and malicious" even absent proof of specific intent to injure.

Thus, one line of cases is that malice may exist by implication or constructively because the debtor's actions indicate he knew that his actions would result in injury, but acted in disregard of that knowledge. *See, e.g. United Bank of Southgate v. Nelson,* 35 B.R. 766, 768 (N.D.Ill.1983) (contains exhaustive analysis of history of "willful and malicious" exception); *In re Clark,* 50 B.R. 122, 126 *supra; In re Lindberg,* 49 B.R. 228, 230 (Bankr.D.Mass.1985); *In re Wolfington,* 47 B.R. 225, 226 (Bankr.E.D. Pa.1985); *In re Frye,* 48 B.R. 422, 427 (Bankr.M.D.Ala.1985). This is true of recent cases decided within the Seventh Circuit. *See In re Jones,* 88 B.R. 899 (Bankr. E.D.Wis.1988), *citing In re Condict,* 71 B.R. 485 (Bankr.N.D.Ill.1987); *In re Hallahan,* 78 B.R. 547 (Bankr.C.D.Ill.1987); *In re Cullen,* 71 B.R. 274 (Bankr.W.D.Wis. 1987).

The other line of cases holds that malice cannot exist constructively or by implication, but must be evidenced by specific intent to injure a person or his property. *See, e.g. In the Matter of Ireland,* 49 B.R. 269, 271 (Bankr.W.D.Mo.1985); *In re Gallaudet, III,* 46 B.R. 918, 925 (Bankr.D.Vt. 1985); *In re Major,* 44 B.R. 636, 639 (Bankr.W.D.Mo.1984).

The specific intent requirement has been sharply criticized for placing an almost insurmountable burden on the creditor. This is particularly true in the area of conversion, as most conversions of property are made to reduce financial strain and reduce expenses rather than to injure the creditor's interest specifically. *See* Comment, *Accidental "Willful and Malicious Injury": The Intoxicated Driver and Section 523(a)(6)*, 1 Bankr.Dev.J. 135, 141 (1984).

As the court in *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1985) stated:

St. Paul argues that the district court applied the correct standard, one which allows malice to be inferred from the circumstances surrounding a debtor's actions. The standard enunciated by us in a case which arose under the parallel section of the old Bankruptcy Act, *Bennett v. W.T. Grant*, 481 F.2d 664 (4th Cir.1973) clearly is applicable here. In *Bennett* we held that specific or "special" malice is not required on the part of the debtor: "if the act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy]." 481 F.2d at 665.

Some courts have found that our holding in *Bennett* is not applicable to the nondischargeability section of the Code, because Congress wished to overrule the holding of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), a case which allowed for a looser showing of willfulness and malice on the part of the debtor. Because we based our holding in *Bennett* on *McIntyre v. Kavanaugh*, 242 U.S. 138, 141–42, 37 S.Ct. 38, 40, 61 L.Ed. 205 (1916), which, in turn, was directly based on *Tinker*, the argument goes, *Bennett* was implicitly overruled by Congress as well. *See In re Hodges*, 4 B.R. 513 (Bkrptcy.W.D.Va. 1980); *but see United Bank of Southgate v. Nelson*, 35 B.R. 766, 770 (N.D.Ill. 1983) (citing other cases which follow *Hodges*).

\*      \*      \*      \*      \*      \*

We reaffirm our holding in *Bennett* and apply the principle that special malice on the part of the debtor of the type argued for by Vaughn is not required under § 523(a)(6) of the Code. We are persuaded by the reasoning in *In re Fussell* and *United Bank of Southgate* that Congress did not intend to overrule the portion of *Tinker* which held that specific malice is not needed.

Confusion has arisen because Congress did intend to modify some aspects of section 17(a)(2) of the former Act, the nondischargeable debt provision, in its 1978 revisions of the bankruptcy law. *Tinker v. Colwell* had held that that section of the old Act was satisfied by "a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally." As noted in *United Bank of Southgate v. Nelson*, 35 B.R. 766, 769, the language of *Tinker v. Colwell* has come to stand for two propositions: first "that the term willful can include reckless disregard of a duty," and second, "that constructive or implied malice was sufficient to establish malice under the exception, and that a showing of special malice was not required."

Under the Code, the willful and malicious language of the Bankruptcy Act was retained, except that the noun modified became "injury to another entity or to the property of another entity" instead of "conversion of the property of another." Nonetheless, Congress did intend to change the effect of that retained language, by overruling *Tinker* to an extent. The House Report for proposed Code § 523(a)(6) noted that

Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a

"reckless disregard" standard, they are overruled.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 365, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320–21.

Congress' reference to *Tinker* has fueled the disagreement among the courts alluded to earlier. Some courts, such as the one in *In re Hodges,* have thought that Congress meant to overrule *Tinker's* holding concerning malice as well as willfulness and have held that specific malice is now required under § 523(a)(6). Others, such as those in *In re Fussell* and *United Bank of Southgate* have held that, because Congress only explicitly referred to the "willful" prong of the *Tinker* holding, the malice prong is intact and no showing of specific malice is required.

We are convinced by the reasoning of *In re Fussell* and *United Bank of Southgate* that Congress did not intend to overrule *Tinker in toto. Bennett* still makes good sense. To require specific malice or some other strict standard of malice for nondischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place "a nearly impossible burden" on a creditor who wishes to show that a debtor intended to do him harm. *United Bank of Southgate,* 35 B.R. at 772. *See also, In the Matter of Nelson,* 10 B.R. 691 (Bkrtcy.N.D.Ill.1981); *In re Matter of Lewis,* 17 B.R. 46 (Bkrtcy.W.D.Ark. 1981); *In re Fussell, supra.* To require such specific malice would restrict § 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor.

*Id.* at 1008–10.

■ This court adopts the reasoning of *Cecchini, St. Paul Fire & Marine Ins. Co.,* and *United Bank of Southgate,* and holds "willful and malicious" to be an intentional or deliberate wrongful act, done without excuse or just cause, which produces or results in harm or injury, and that the wrongdoer need not have a specific intent

to cause the resulting harm or injury to the person and property of the plaintiff. It is the intent to do the act which is the operative legal event, and not the intent to do the harm. *In re Nuckols,* 47 B.R. 731, 735 *supra.*

Thus, the phrase "willful and malicious" under 11 U.S.C. § 523(a)(6) does not connote or require personal hatred, ill-will, spite or special malice. *In re Lindberg,* 49 B.R. 228, 230, *supra. In re Friedenberg,* 12 B.R. 901, 905 (Bankr.S.D.N.Y.1981); *In re Salai,* 50 B.R. 11, 12 (Bankr.Fla.1985); *In re Dever,* 49 B.R. 329, 332 (Bankr.Ky. 1984). That is, a specific intent to do harm is not necessary. *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986).

It must also be noted that the use of the conjunctive and the phrase "willful and malicious", requires that both elements be present in order for the debt to be nondischargeable. *Matter of Schwenn,* 44 B.R. 746, 748 (Bankr.Wis.1984).

■ In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the debtor. *In re Linn,* 38 B.R. 762 (9th Cir.B.A.P. 1984); *In re Marino,* 29 B.R. 797 (N.D.Ind. 1983). The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman,* 25 B.R. 545 (Bankr.S.D.Cal.1982). This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan,* 46 B.R. 380 (Bankr.E.D.N.Y.1985); *In re Nicoll,* 42 B.R. 87 (Bankr.N.D.Ill.E.D. 1984).

Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element. *In re Kreps,* 700 F.2d 372, 376 (7th Cir.1983); *In re Bowers,* 43 B.R. 333 (Bankr.E.D.Pa. 1984); *Matter of Reinstein,* 32 B.R. 885 (Bankr.E.D.N.Y.1983); *In re Paley,* 8 B.R. 466 (Bankr.E.D.N.Y.1981). The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to

establish that the debt is squarely within the statutory exceptions. *In re Marino*, 29 B.R. 797 at 799, *supra.*

■ The court would also note that the standard of proof to be applied in a nondischargeability proceeding under §§ 523(a)(2)(A), (4) and (6), is that of clear and convincing evidence, rather than by a preponderance of the evidence. *In re Kimzey*, 761 F.2d 421, 423–24 (7th Cir.1985) (§ 523(a)(2)(A)), *In re Peoni*, 67 B.R. 288, 291 (Bankr.S.D.Ind.1986) (§ 523(a)(6)), *citing, In re Kaufmann*, 57 B.R. 644 (Bankr. E.D.Wis.1986) (§ 523(a)(2)(A) and § 523(a)(6)), and *Matter of Wintrow*, 57 B.R. 695 (Bankr.S.D.Ohio 1986), and *In re Egan*, 52 B.R. 501 (Bankr.D.Minn.1985) (§ 523(a)(6)); *In re Sutton*, 39 B.R. 390 (Bankr.M.D.Tenn.1984) (§ 523(a)(4)); *In re Graziano*, 35 B.R. 589, 593 (Bankr.E.D.N. Y.1983) (§ 523(a)(4)).

The Court perceives two possible operative events that could constitute a "willful and malicious" conversion of the Plaintiff's vehicle pursuant to § 523(a)(6).

First, the Defendant, as an officer of the corporate lessee, without prior permission of the Plaintiff, either express or implied, caused or permitted the vehicle to be taken out of the continental United States, and placed the same in the control and custody of an agent in direct breach of the lease agreement, and as a direct result thereof, the vehicle was wrongfully taken by a third party.

Secondly, assuming that the commercial invoice is genuine, the Defendant as an officer of the corporate lessee, wrongfully sold the leased vehicle to a third person without any right to do so whatsoever.

The Defendant makes two initial assertions. One, that he was merely an officer of Automotive, and though he signed the lease he did so only in his corporate capacity and not personally. Thus, the argument goes since he had no personal contractual liability under the lease, he has no personal liability under § 523(a)(6).

Secondly, the Defendant asserts he did not read the lease before he signed it, and that he had no actual knowledge that the lease prohibited Automotive from sending the car out of the continental United States.

■ It is true at common law that a corporate officer, stockholder, director, agent or employee is not personally liable for the torts of a corporation or of any other agent merely because of his office or holdings, and that some additional connection with the tort is required. *Bowling v. Holdeman*, 413 N.E.2d 1010 (Ind.App. 1980); *Birt v. St. Mary Mercy Hospital of Gary, Inc.*, 175 Ind.App. 32, 370 N.E.2d 379 (1977). However, a corporate officer or shareholder cannot escape liability by claiming that he acted on behalf of a corporation because an agent is liable for his own torts. *American Independent Management Systems, Inc. v. McDaniel*, 443 N.E.2d 98 (Ind.App.1982) (corporate officers cannot escape liability for fraud by claiming he acted on behalf of corporation where corporate officers personally participated in fraud); *Howard Dodge & Sons, Inc. v. Finn*, 181 Ind.App. 209, 391 N.E.2d 638 (1979), (officer personally liable for conversion as well as corporation. An agent who commits a tortious act is equally liable with the principal and agent cannot escape liability on the grounds he acted for a principal). Thus, when a personal debtor who, as an officer of a corporation, actually participates in the conversion of property which is subject matter to the security interest of a third party, he is personally liable to said party and thus the debt is nondischargeable pursuant to § 523(a)(6). *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir.1987). *Citing, In re Nicoll*, 42 B.R. 87 (Bankr.E.D.Ill.1984); *In re Schwartz*, 36 B.R. 355, 359 (Bankr.E.D.N. Y.1984) and, *Matter of Penning*, 22 B.R. 616 (Bankr.E.D.Mi.1982); *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Cir.1986).

Section 523(a)(6) sounds in tort and the Plaintiff's allegations are for tortious conversion of the leased vehicle, and thus the fact that the Defendant was an officer or shareholder of Automotive, the corporate lessee, and did obligate himself personally on the lease is no defense.

Although this adversary sounds in tort, it is based on an underlying contract between the parties. Thus, the Court will look to certain basic legal principles regarding realty of consent and knowledge of the contents of a written agreement. It is the Indiana law of contracts applicable to this lease that a court will not relieve a party from the terms of his contract simply because he did not read it; he is bound to know its terms and its contents, and his want of care will not avoid it. *Wall Construction Company v. Chipman*, 202 Ind. 434, 175 N.E. 132 (1931); *Givan v. Masterson*, 152 Ind. 127, 51 N.E. 237 (1898); *Keller v. Orr*, 106 Ind. 406, 7 N.E. 195 (1885); *Robinson v. Glass*, 94 Ind. 211 (1883), (negligence on the part of one who can read but does not read an instrument which he executes will bar relief from the contract where no trick or artifice was resorted to induce the execution thereof); *American Insurance Company v. McWhorter*, 78 Ind. 136 (1881); *Beist v. Sipe*, 16 Ind.App. 4, 44 N.E. 762 (1896). The law creates a presumption that a party to a written agreement or instrument knows the contents of the agreement he signs, and he cannot generally rely upon statements of others as to the character, content, or legal effect of an instrument. *Paxton–Eckman Chemical Company v. Mundell*, 62 Ind. App. 45, 112 N.E. 546 (1916); *Hoerger v. Citizen's Street Railroad Company*, 36 Ind.App. 662, 76 N.E. 328 (1905). *See also, Carney v. Central National Bank of Greencastle*, 450 N.E.2d 1034 (Ind.App. 1st Dist.1983).

In construing a contract, a court's paramount consideration is the objective, not the subjective, intent of the parties. *Lincoln National Life Ins. Co. v. NCR Corp.*, 603 F.Supp. 1393 (N.D.Ind.1984), *aff'd* 772 F.2d 315 (7th Cir.1985). Thus, if a contract is clear and unambiguous on its face, its effect will not be controlled by an erroneous construction placed on the agreement by the parties. *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Equip. Corp. of America*, 160 Ind.App. 26, 309 N.E.2d 464 (3rd Dist. Ind.App.1974).

Although the foregoing principles are applied primarily in breach of contract cases rather than tort cases, they are also relevant in determining whether the disposition of collateral contrary to the express terms of a security agreement or lease is willful and malicious pursuant to § 523(a)(6).

The Court will deal first with the issue of whether the wrongful removal of the vehicle from the United States, and the shipping thereof to the Middle East, which was clearly contrary to the express terms of the lease constituted "willful and malicious" injury.

Clearly, there was a conversion of the vehicle when the vehicle was intentionally and deliberately sent out of the continental United States contrary to the express prohibition against such an act contained in the lease and without the consent of the Plaintiff, express or implied. By this conduct the Defendant, and Automotive through the Defendant, exercised control over the vehicle in such a way as to be in direct contravention of the rights of the Plaintiff as owner of the vehicle.

The question is whether this conduct constitutes a mere *technical* conversion, without malice and in good faith or with justification, and thus the debt that accrued by that conversion is generally dischargeable in the Defendant's bankruptcy, or does such conduct constitute "willful and malicious" injury to the Plaintiff's property, and thus is nondischargeable.

The United States Supreme Court in the case of *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), had reason to analyze § 17(2) of the former Bankruptcy Act (former 11 U.S.C. § 35) which excepted from discharge "willful and malicious injuries" to the property of another. In that case the Debtor was a retail dealer of automobiles. The Debtor borrowed a sum of money from Aetna to purchase a certain car for resale at retail and granted Aetna a chattel mortgage and a trust receipt in the vehicle to secure the debt. By these documents the Debtor agreed not to sell, pledge, or otherwise dispose of the vehicle unless Aetna consented in writing. The Debtor sold the vehicle at retail in the ordinary course of

his business without concealment, though without written consent and did not remit the monies to Aetna. The evidence showed that on many occasions in the past, vehicles had been secured on like terms, sold without express consent, and the proceeds accounted for thereafter. The Debtor filed bankruptcy, and Aetna contended that the debt arising from the sale of the vehicle was nondischargeable pursuant to § 17(a)(2) of the Bankruptcy Act. Judge Cardoza for the Court stated as follows:

There is no doubt that an act of conversion, if wilful and malicious, is an injury to property within the scope of this exception. Such a case was *McIntyre v. Kavanaugh*, 242 U.S. 138 [37 S.Ct. 38, 61 L.Ed. 205], where the wrong was unexcused and wanton. But a wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice. *Boyce v. Brockway*, 31 N.Y. 490, 493; *Laverty v. Snethen*, 68 N.Y. 522, 527; *Wood v. Fisk*, 215 N.Y. 233, 239, 109 N.E. 177; *Stanley v. Gaylord*, 1 Cush. (Mass.) 536, 550; *Compau [Campau] v. Bemis*, 35 Ill.App. 37; *In re DeLauro*, 1 F.Supp. 678, 679. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. Turning to the findings here, we see that willfulness and malice have been unmistakably excluded. *Cf. In re Dixon*, 21 F.(2d) 565, 566; *In re Burchfield*, 31 F.(2d) 118, 119. The trial court made a special finding as follows: "The court finds that the defendant in this case was not actuated by willful, malicious or criminal intent in disposing of the car in question." In these circumstances the respondent is not helped by the later and general finding that the petitioner was "guilty of legal conversion of the property, as described in the count in trover." The special controls the general, just as upon the verdict of a jury. *Walker v. New Mexico & S.P.R.Co.*, 165 U.S. 593, 598 [17 S.Ct. 421, 422, 41 L.Ed. 837]; *Victor–American Fuel Co. v. Peccarich*, 209 Fed. 568, 571.

Nothing in the judgment of the Illinois Appellate Court is at war with the exculpatory finding made upon the trial. The Appellate Court repeats the words of the trial judge without hint of disapproval. Its only comment is that under the law of Illinois malice and wrongful intent are not necessary constituents of a cause of action in trover. This, of course, is true, but though true, it is beside the mark. The discharge will prevail as against a showing of conversion without aggravated features.

*Id.* 293 U.S. at 332–33, 55 S.Ct. at 153.

As noted by the Seventh Circuit in *In re Kimzey*, 761 F.2d 421 (7th Cir.1985), when the Debtor sells secured collateral, the creditor's security interest—its protection against the Debtor's bankruptcy vanishes; and finding the debt as nondischargeable under § 523(a)(6) thus puts the creditor in the same position as he would have been but for the willful and malicious conversion, *citing In re Scotella*, 18 B.R. 975, 976 (Bankr.N.D.Ill.1982).

A common law conversion in Indiana is defined as an unauthorized act which deprives an owner of his property permanently or for an indefinite time, or an unauthorized and wrongful exercise of dominion and control over another's personal property to the exclusion of or inconsistent with the rights of the owners. *Matter of Burdick*, 65 B.R. 105 (Bankr.N.D.Ind.1986), *citing Yoder Feed Service v. Allied Pullets, Inc.*, 171 Ind.App. 692, 359 N.E.2d 602 (1977). However, under Indiana law "mens rea" is not an essential element of such tort, and the fact that the tortfeasor may have acted in good faith in assuming dominion over the owner's property is immaterial. *Howard Dodge & Sons v. Finn*, 181 Ind.App. 209, 391 N.E.2d 638 (1979). Accordingly, an act might constitute a mere technical conversion and liability under state law, without the same being also "willful and malicious", and thus not ren-

der such a debt nondischargeable under § 523(a)(6), which is based on federal law with federal standards rather than state law.

The District Court in *United Bank of Southgate v. Nelson*, 35 B.R. 766 (N.D.Ill. 1983) sets out a very thoughtful analysis of the meaning "Malicious" under § 523(a)(6) in the context of conversion. Because of the problems of defining malicious conduct in this area the Court will take the liberty of quoting this case in length. The *Southgate* court state as follows:

> One line of cases, primarily early interpretations of § 523(a)(6), read the legislative record to entirely obviate *Tinker.* Consequently, these courts interpret the requirements of § 523(a)(6) to be: (1) *willful,* meaning intentional or deliberate (i.e. not reckless); and (2) *malicious,* to require an "intent to do harm," (i.e. something more than implied malice). *In re Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va. 1980); *In re McLaughlin,* 14 B.R. 773 (Bkrtcy.N.D.Ga.1981); *In re Aldrich,* 16 B.R. 825 (Bkrtcy.W.D.Ky.1982); *In the Matter of Gentis,* 10 B.R. 209 (Bkrtcy.S. D.Ohio 1981); *In re Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980); *In re Hawkins,* 6 B.R. 97 (Bkrtcy.W.D.Ky.1980); *In re Finnie,* 10 B.R. 262 (Bkrtcy.D.Mass. 1981); *In re Nelson,* 10 B.R. 691, 4 CBC 2d 548 (Bkrtcy.N.D.Ill.1981).
>
> A second, more recent line of cases, places much less emphasis on the legislative record in interpreting § 523(a)(6) and continues to allow malice to be established through implied or constructive malice. These Courts interpret the exception to require: (1) *willful* to mean deliberate or intentional: and (2) *malicious* to be implied or constructive malice similar to the holding in *Tinker. In re Scotella,* 18 B.R. 975 (Bkrtcy.N.D.Ill. 1982); *In re DeRosa,* 20 B.R. 307 (Bkrtcy.S.D.N.Y.1982); *In re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980); *In the Matter of Klix,* 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E.D.Mich.1982); *In the Matter of Chambers,* 23 B.R. 206 (Bkrtcy.W. D.Wis.1982); *In re Fussell,* 15 B.R. 1016 (D.C.W.D.Ba.1981); *In re Ries,* 22 B.R. 343 (Bkrtcy.W.D.Wis.1982); *In re Au-*

*venshine,* 9 B.R. 772 (Bkrtcy.W.D.Mich. 1981).

The above cited Congressional comments are, in fact, the source of the split in Bankruptcy opinions construing § 523(a)(6).

\*     \*     \*     \*     \*     \*

It is this notion that both holdings of *Tinker* were overruled which is responsible for the split in defining malice under § 523(a)(6). A review of the two lines of cases interpreting § 523(a)(6) demonstrates this confusion and accounts for the two different standards formulated for the *malicious* requirement.

Careful review of the cases holding *malice* under § 523(a)(6) to require an "intent to do harm", reveals that *In re Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va.1980) is key in formulation and propagation of that standard. In *Hodges,* the debtor had purchased a stereo and executed a security agreement thereon. The security agreement provided that Hodges not sell, pledge, pawn or remove the goods from the address shown without the consent of the plaintiff. Shortly thereafter, Hodges became financially stressed due to illness and was unable to make regular payments on his residence or to support his family. The stereo was sold and the proceeds were used to make house payments and purchase food for the family. The Court found that Hodges did not realize that the plaintiff held a security interest in the stereo, but did understand that the plaintiff had some right pertaining to the stereo. The Court also noted that Hodges had not read the security agreement. The Court held that while the act of selling the stereo was intentional, thereby meeting the willful requirement of § 523(a)(6), it was not done maliciously. Hodges did not know the stereo was security and motivationally the stereo had been sold so that Hodges could feed his family. It was not sold with a conscious intent to harm the creditor or his property. The debt was held dischargeable in bankruptcy.

The *Hodges* decision is premised upon the view that "with the change in bankruptcy law in 1978 came a change in the standards applicable in construing § 523(a)(6)." *Id.* at 515. According to *Hodges*, the Supreme Court defined the standard for "willful and malicious injury" in *Tinker*. The *Hodges* Court interpreted that standard to be, in general, one of "reckless disregard." (*Id.* at 515). The court read of the above cited legislative record to mean that the *Tinker* standard was abolished under the Code.

Additionally, the *Hodges* Court held that inasmuch as the Fourth Circuit in *Bennett v. W.T. Grant Co.*, 481 F.2d 664 (4th Cir.1973) upheld the *Tinker* standard, it was also overruled. *Bennett* held that "if the act of conversion is done deliberately and intentionally in *knowing disregard* of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice." *Id.* at 665. The *Hodges* Court apparently equated "reckless disregard" with "knowing disregard". Since the Congressional commentary expressly stated that "to the extent other cases have relied on *Tinker* to apply a *reckless disregard* standard, they are overruled." (Emphasis supplied), the *Hodges* court reasoned that "the 'knowing disregard' standard was expressly overruled." *Hodges* at 515.

In light of what it viewed as the obviation of the *Tinker* standard of implied or constructive malice, and "its Fourth Circuit companion" of knowing disregard, the *Hodges* Court looked to what it deemed "non-Tinker law" for an alternative standard for malice. While the willful requirement was defined to mean intentional or deliberate, *Hodges* substantially relied on *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) to establish the "intent to do harm" standard for maliciousness.

\*     \*     \*     \*     \*     \*

*[H]odges* interprets *Davis* to hold that since every conversion does not constitute a willful and malicious injury, "that

malice must encompass 'an intent to harm' the creditor." *Hodges* at 516.

Those cases which hold an "intent to harm standard" for the malicious requirement of § 523(a)(6) are based on the *Hodges* interpretation that Congress completely obviated the *Tinker* standard. Similarly, they have adopted the view that *Davis* held an "intent to do harm" standard. Many of these courts feel compelled to adhere to this standard because they deem it to represent legislative intent. However, many courts have expressed considerable dissatisfaction with the interpretation. The main thrust of the criticism is that, in the context of a debtor who disposes of encumbered property prior to bankruptcy, adherence to a rigid standard of malice effectually denies the secured creditor his very security in the property by placing a nearly impossible burden on him to prove a subjective intent by the debtor to do harm.

In following the "intent to do harm" standard enunciated in *Hodges*, because it "correctly reads the intent of Congress," the Court *In the Matter of Nelson*, 10 B.R. 691, 4 CBC 2d 548 (Bkrtcy. N.D.Ill.1981) notes:

The *Hodges* case places an almost insurmountable burden on the creditors when their secured property is sold, and a burden this court is not entirely comfortable with. *Id.* at 549.

When the injury is directly to a person or the property of another, a standard of intentional harm is understandable. . . . But when the injury is conversion of secured property, such a standard virtually renders the remedy meaningless. Under what circumstances, for instance, would a debtor ever sell secured property out of malice? *Id.* at 549.

With serious reservations about the ease with which debtors can avoid the non-dischargeability of a debt after conversion of property subject to a security interest, the Court followed Hodges, . . . . *Id.* at 550.

\*     \*     \*     \*     \*     \*

In more recent case law, dissatisfaction with the *Hodges* standard has led to

a marked tendency by the courts to follow the intentional and deliberate definition of willful, but to strain to avoid what they view as the harsh and unfair results of the "intent to do harm" definition of malice. In general these cases seek to circumvent the apparent Congressional intent to obviate the *Tinker* standard and to apply the implied or constructive malice standard to the malicious requirement. This result is achieved through three distinct approaches.

One approach is not to consult the legislative history as was done by the Court in *Credit Thrift of America v. Auvenshine*, 9 B.R. 772 (Bkrtcy.W.D. Mich.1981). *See also In re Klix*, 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E.D.Mich. 1982).

\* \* \* \* \* \*

Finding no ambiguity in the meaning of the section, resort to legislative history was unnecessary. Willful was interpreted to mean intentional or deliberate, and the *Tinker* standard of malicious was held to be operative and controlling. *Auvenshine* at 775.

\* \* \* \* \* \*

The second approach utilized by Bankruptcy Courts to mitigate the "intent to harm" standard of malice is to reconcile the conscious intent to do harm standard and the less stringent implied malice standard as two different interpretations of the "intent to do harm" standard. *E.G. Wisconsin Finance Co. v. Ries*, 22 B.R. 343 (Bkrtcy.W.D.Wis.1982); *In re Chambers*, 23 B.R. 206 (Bkrtcy.W.D.Wis. 1982). In *Ries* the Bankruptcy Court notes that there is little difficulty in defining the term willful under § 523(a)(6) as intentional or deliberate; however, the Courts are split as to what constitutes "malice" where a debtor has willfully sold secured property. The Court contends that "malice" is property defined as "intent to harm" but that it can be interpreted in two ways; one requiring specific intent to harm the creditor, and the other requiring no showing of ill-will, rather only knowledge that his act will harm another and proceeds in the face of

that knowledge. *Ries* at 346–7. In evaluating these two interpretations, the "special intent" standard is determined to be disadvantageous because it places an insurmountable burden on creditors to prove intent when their secured property is sold and denies the creditor a meaningful remedy under this section of the Code. Therefore, the Court applies the second looser standard, that the debtor must have knowledge that harm would result from his conduct and that the debtor's knowledge may be inferred. *Id.* at 347.

This approach is essentially an application of the *Tinker* standard of implied malice, but in the guise of an interpretation of an "intent to do harm" standard. The approach successfully avoids the disadvantages of the "intent to do harm" standard without dealing directly with the question of the legislative intent behind the exception.

The third approach seems to be the predominant one, and it entails a re-examination of the legislation record behind § 523(a)(6). These cases take account of *Tinker's* dual holding and find that Congress intended to overrule only *Tinker's* first holding, that a "reckless disregard" standard can satisfy the "willful" requirement. Congress did not, these courts reason, intend to disturb *Tinker's* definition of the "malice" requirement. *In re Fussell*, 15 B.R. 1016 (D.C.W.D.Va.1981); *In re McCloud*, 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980); *In re DeRosa*, 20 B.R. 307 (Bkrtcy.S.D.N.Y. 1982); *In the Matter of Klix*, 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E.D.Mich. 1982).

The District Court in *United Bank of Virginia v. Fussell*, 15 B.R. 1016 (D.C. W.D.Va.1981), followed this approach.

\* \* \* \* \* \*

The Court reasoned that under the new Code, the "reckless disregard" definition overruled by Congress applied only to the "willful" requirement. The Court held that the Code did not statutorily alter the *Tinker* definition of "malicious." Nor did it find anything in the

legislative history of the section to suggest that Congress intended to overrule the *Tinker* courts interpretation of "malicious." *Fussell* at 1022.

This court believes that *Fussell* represents an accurate reading of the legislative intent underlying this exception. We, therefore, accept the *Fussell* standard of implied or constructive malice for the following reasons: (1) Congress did not intend to overrule the standard of implied malice as set out in *Tinker;* (2) *Davis* does not hold an "intent to do harm" standard for malice in contrast to the standard delineated in *Tinker;* and (3) the standard of implied malice is strongly recommended by public policy.

\* \* \* \* \* \*

There is no clear indication that Congress intended to overrule those cases interpreting *Tinker* as a malice holding. *Tinker* specifically adopted a standard of implied malice and expressly rejected an "intent to harm" standard. Moreover, the legislative record itself indicates that a specific "intent to do harm" is contrary to Congressional intent.

> The intent is to include in the category of nondischargeable debts a conversion under which the debtor willfully and maliciously intends to borrow property for a short period of time *with no intent to inflict injury but in which injury is in fact inflicted.*

*In re Scotella,* 18 B.R. 975, 977 (Bkrtcy. N.D.Ill.1982) *citing* H.R. No. 95–595, 95th Cong., 1st Sess. (1977), p. 364, U.S. Code Cong. & Admin.News, 1978, 6320. A situation in which a debtor sells secured property knowing that the sale would injure the creditor by depriving him of his collateral and proceeds in the face of that knowledge is the type of debt Congress intended to make non-dischargeable under § 523(a)(6). *In re Scotella, supra* at 977. This is consistent with the type of debt deemed non-dischargeable under the parallel exception of the old Act, "if the act of conversion is done *deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory ex-*

*clusion even though there may be an absence of special malice."* Bennett v. W.T. Grant Co., supra at 665.

Secondly, this court disagrees with the *Hodges* view that *Davis v. Aetna, supra,* represents "non-Tinker law" and holds an "intent to do harm" standard for malicious under this exception. To the contrary, this court believes the *Davis* holding is consistent with the *Tinker* standard of implied malice. *Davis* held that every instance of conversion did not automatically establish a willful and malicious conversion which would except the debt from discharge.

\* \* \* \* \* \*

In *Davis* there was a technical or innocent conversion represented by the fact that the automobile was sold without written consent and the proceeds retained, but there existed no "aggravated features", 55 S.Ct. at 153, to constitute willful and malicious conversion. The sale was made without concealment and Aetna was notified of the sale on the same day. Most importantly the car was sold in the ordinary course of business and on many other occasions, perhaps even customarily, cars held upon the same terms had been sold without express consent and the proceeds accounted for later. This fact suggests the conversion was "honest but mistaken" seemingly "engendered by a course of dealing, that powers have been enlarged or incapacities removed."

*Davis* is merely an example of an innocent or mistaken conversion and as such, dischargeability of the debt in bankruptcy is consistent with the policy that the innocent or honest debtor is to be relieved in bankruptcy and not the malicious wrongdoer. *See also In re Roberts,* 8 B.R. 291 (D.C.W.D.Mo.1981) (a good faith mistake precludes a malicious intent).

\* \* \* \* \* \*

*Davis,* therefore, is not, as *Hodges* suggests, a Supreme Court enunciated alternative standard to the implied malice standard of *Tinker;* rather, it is a con-

sistent interpretation of the exception for willful and malicious injury.

Finally, the implied malice standard of *Tinker* is a favored interpretation because it is consistent with the policy historically underlying this exception to bankruptcy. It was an honest debtor, and not a malicious wrongdoer, that was to be discharged. *Tinker, supra* 24 S.Ct. at 509. Under the *Tinker* standard, malice may be inferred from the nature and conduct of the act itself which allows the court to fairly evaluate all the factors of a situation. In the commercial context, the rigid and subjective "intent to do harm" standard makes it nearly impossible to prove malice except by the debtor's own admission and makes it too easy for the debtor to avoid the non-dischargeability of a debt after conversion of property subject to a security interest.

The implied malice standard of *Tinker* also is in harmony with the policy underlying the preferred position of secured creditors in bankruptcy proceedings. It protects the integrity of secured property and does not render the security agreement a meaningless instrument. A rigid "intent to harm standard" effectually denies the secured creditor his very security in the property by placing a nearly impossible burden on him to prove a subjective intent by the debtor to do him or his property harm. It permits a debtor's financial difficulties to serve as both justification for the conversion of collateral and a rebuttal to a requirement of an intent to harm the creditor. When a creditor takes all appropriate steps to secure his interest in an agreement, the law will protect those efforts.

For these reasons, this court holds that in the context of a debtor who sells encumbered property prior to bankruptcy, "willful and malicious injury" means a deliberate or intentional act in which the debtor knows his act would harm the creditor's interest and proceeds in the fact of the knowledge. The debtor's knowledge may be inferred from his experience in business, his concealment of the sales, his admission that he had read the security agreement which forbid the sale or that he understood what was meant by the term security agreement and collateral used as security. *In re Ries,* 22 B.R. 343, 347 (Bkrtcy.W.D.Wis. 1982); *In re Klix,* 23 B.R. 187, 7 CBC 2d 276, 280 (Bkrtcy.E.D.Mich.1982); *In re Donofrio,* 19 B.R. 734, 736 (Bkrtcy.W.D. Ohio 1982); *In re Scotella,* 18 B.R. 975, 977 (Bkrtcy.N.D.Ill.1982). A merely technical or innocent conversion, or one under mistake, absent aggravated features does not strictly constitute "willful and malicious injury." *Davis v. Aetna, supra* 55 S.Ct. at 153.

*Id.* at 770–77. *Accord, Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1263 (11th Cir.1988).

Even though the November 2, 1982 document executed by the parties was a true lease rather than a lease with an option to buy or a lease in the nature of a security agreement, or a pure security agreement, the cases construing whether a "willful and malicious" conversion took place based upon a security agreement are applicable here. In fact, a lessee's rights in dealing with a chattel under a true lease are usually much more limited or restricted than those of a debtor dealing with his own property under a security agreement—particularly when the subject matter of the property converted is one tangible item of personalty rather than a "revolving" or "dragnet" lien in inventory and accounts receivable and the proceeds thereof. Under a true lease the lessor at all times remains the sole owner of the leased chattel, while normally under a security agreement, the property interest of the secured creditor is in the nature of a security interest or lien in property in which the Debtor is the owner. Also of particular importance is the past conduct of the parties. Quite often although the terms and conditions of a security agreement technically require the debtor to perform in a strict and certain manner regarding the use and disposition of the collateral, and the proceeds thereof, in fact this is often not really the case. Thus, a fact pattern often is found in which the secured party has knowingly through a course of conduct over a

protracted period of time, either expressly or impliedly condoned or acquiesced in the debtor dealing with the security or the proceeds thereof contrary to the terms and conditions of the security agreement or lease, and the debtor has reasonably relied on the creditor informally sanctioning such prior course of conduct. In such a case a conversion of the collateral may be technical in nature and not within the scope of § 523(a)(6) as being "willful and malicious". *See, e.g., Davis v. Aetna Finance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 *supra; In re Bridges*, 51 B.R. 85 (Bankr. Ky.1985); *In re Holtz*, 62 B.R. 782 (Bankr. N.D.Iowa 1986); *In re Nelson*, 67 B.R. 491 (Bankr.D.Minn.1985); *In re Tester*, 62 B.R. 486 (Bankr.W.D.Va.1986); *In re Brubaker*, 57 B.R. 736 (Bankr.W.D.Va.1986). Thus, every conversion of collateral in violation of the security agreement or a lease as in the case at bar does not constitute a "willful and malicious" act which is nondischargeable under § 523(a)(6).

The Court concludes that in order to prevail on such a nondischargeability claim based on conversion of collateral, the creditor need not prove that the debtor had a *specific* intent to deprive the creditor of his rights in the collateral, but the creditor must prove that the transfer of the collateral was an intentional violation of the security agreement, necessarily harmed the creditor, and was without excuse. *In re Hodges*, 83 B.R. 25 (Bankr.W.D.Cal.1988). Thus, where a debtor has disposed of collateral without the permission or knowledge of the lien holder, and the debtor understands the effect of the agreement, the unauthorized disposition constitutes willful and malicious conversion under § 523(a)(6). *Matter of Petsch*, 82 B.R. 605 (Bankr.M.D.Fla.1988).

The fact that the Defendant had a mistaken belief that he was not in violation of the agreement, and acted from a subjective belief that he had certain rights under the agreement which he did not have will not excuse the Defendant's conversion of a chattel in the case at bar. The Debtor's malice must be determined at least in part by the objective likelihood of harm to the creditor's interest created by the Debtor's actions. *In re Nelson*, 67 B.R. at 498, *supra.*

The Court in *In re Long*, 774 F.2d 875 (8th Cir.1985) had some instructive comment on conversion under § 523(a)(6). The *Long* court stated as follows:

We are quite aware that there are many expressions of dissatisfaction with discharging debts incurred through intentional breach of security agreements, where the debtor's intent to repay, and thereby prevent economic loss, has been shown to be unrealistic if not insincere. Such dissatisfaction was expressed in the recent case of *In re Clark*, 50 B.R. 122 (Bkrtcy.D.N.D.1985), where the bankruptcy judge "over-ruled" the intent-to-harm standard of *Hodges* and later cases, as applied by a predecessor judge and affirmed by the district court in *Matter of Langer*, 12 B.R. 957 (D.N.D.1981).

The difficulty which the lower courts are currently encountering in applying § 523(a)(6) seems attributable, at least in part, to the frequent failure to separately analyze the elements of malice and willfulness. Despite the general difficulty in applying the § 523(a)(6) exception, there is a virtual consensus of opinion that "willful," standing alone, means intentional or deliberate. *See e.g., Matter of Morgan*, 22 B.R. 38, 39 (Bkrtcy.D.Neb. 1982); *In re Tanner*, 31 B.R. 338, 339 (Bkrtcy.S.D.Fla.1983). It is the definition of malice, or the disregard of it as a separate term, which has been troublesome.

Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is

insufficient to establish malice, absent some additional "aggravated circumstances," under *Davis* and its recent progeny.

Having determined that a heightened level of culpability must be found, going beyond recklessness and beyond intentional violation of a security interest, we turn to the task of articulating a workable standard. The bankruptcy courts have frequently attempted to define this level of culpability by speaking in terms of intentional harm. Malice is thus being given a meaning more nearly coinciding with common usage. One perceptive case turns to the Restatement (Second) of Torts, § 8A, Comment b, and uses intentional harm as a requirement for the bar to discharge, with the qualification that the expected harm must be "certain or substantially certain" to occur. *In re Fercho*, 39 B.R. 764, 766 (Bkrtcy.D.N.D.1984). The Restatement observes that this is a stricter test of fault than the standard of recklessness. It is also consistent with the previously quoted *Tinker* language, allowing a finding of malice when conduct "*necessarily* causes injury." 193 U.S. at 487, 24 S.Ct. at 509 (Emphasis added). This phrase in *Tinker* has apparently not been criticized in the recent cases. Until a better definition can be formulated for use in this context, we accept the Restatement definition as helping to focus inquiry in applying the statutory "willful and malicious injury" requirement. When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm.

This test seems to explain most of the recent cases favoring debtors when malicious conversion is alleged. It is a standard that at least partially satisfies the complaint of secured creditors who have been "done wrong" that they are faced with almost impossible obstacles in asserting nondischargeability because of

actual malice. While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent. Use of objective information to ascertain intent to cause harm is by no means unfamiliar. *Bogard v. Cook*, 586 F.2d 399, 412 (5th Cir.1978), *cert. denied* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979) (appraising official immunity defense); *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396, 400 (8th Cir.1976) (tort liability of moving company).

\* \* \* \* \* \*

Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interest of the creditor, such a breach of contract does not, in and of itself, preclude a discharge. If Congress wishes to tighten or redefine the nondischargeability rule in question, it can amend the Code as it did last year to prevent discharge from drunk driving damages.

*Id.* at 880–882.

In the case at bar the Defendant, without any colorable right, title, or interest in the Plaintiff's property except as a true lessee, and without the consent of the Plaintiff, either express or implied, intentionally, knowingly, and deliberately permitted the Plaintiff's property to be transported out of the United States. This was clearly done in willful disregard of the Defendant's duties to the Plaintiff relative to the property pursuant to the lease.

This unauthorized use of the vehicle by the Defendant was deliberate and intentional, and without any legal justification, just cause or excuse, and can in no manner be characterized as merely negligence, a reckless disregard, indifference, or gross negligence and was thus "willful" within the meaning of § 523(a)(6).

As noted above, the requirements of § 523(a)(6) are in the conjunctive, and thus the Plaintiff also had the burden of proving that the Defendant's acts were not only "willful" but "malicious". If an act relat-

ing to the collateral is an intentional act and a deliberate violation of the agreement between the parties without being "malicious", the creditor is merely the holder of a dischargeable breach of contract claim rather than a nondischargeable debt based on § 523(a)(6).

The Defendant asserts that he did not actually know that the express terms of the lease prohibited the transport of the vehicle outside of the United States without the express permission of the Plaintiff-lessor, even though he was a signatory thereto as he did not read the lease. He further asserts that the sale of the motor vehicle was wrongfully accomplished by a third person without his express or implied consent and thus was not his responsibility. Accordingly, the Defendant asserts that his acts were not "malicious" in that he did not specifically intend to damage the Plaintiff, and thus the second element necessary for the Plaintiff to prevail under § 523(a)(6) has not been proven.

The Defendant is a man of considerable business experience and sophistication, and cannot be heard to say that he nor Automotive were not charged with knowledge of the contents of the lease simply because he did not take the time to read the same, particularly in the absence of any evidence whatsoever of coercion, fraud, undue influence, lack of good faith, or other unconscionable conduct by the Plaintiff relative to the execution or terms of the lease, whereby the knowing execution thereof, and the reality of assent thereto, could reasonably be called into question.

This Court, particularly in the context of a commercial transaction where the Debtor is a person of considerable business experience, will not countenance the "pure of heart but empty of head" defense that he either did not read the document relating to the transaction or did not understand its contents, and thus acted in good faith, and although in direct violation of the express terms thereof did not intentionally and deliberately dispose of or misuse the collateral. If such an explanation were to be accepted by the Court as a defense in the context of willful and malicious conversion under § 523(a)(6), whatever integrity that the law attempts to attach to a lease or security agreement would be for all practical purposes rendered for naught in most instances. A prudent and commercially reasonable lender or lessor would be denied the legal benefits of its efforts to protect its interest in the property. The Court would note that it is possible that a contrary result might be reached in the case of an unsophisticated consumer with limited education who executes a contract of adhesion wherein the rights of the creditor in the chattel are hidden in the fine print, or where the Debtor is at most negligent in the conduct of his personal affairs. See e.g., In re Casselli, 4 B.R. 531 (Bankr.C.D. Cal.1980); In re Brubaker, 57 B.R. 736 (Bankr.W.D.Va.1986). Thus, the Court finds that the Defendant's conduct in derogation of the Plaintiff's rights under the lease to be "willful".

As noted above, this court adopts the objective test of malice as set out by the court in In re Cecchini, 780 F.2d 1443, supra, i.e. when a wrongful act, done intentionally, necessarily produces harm and is without just cause or excuse, it is "malicious" even absent a specific intent to injure. No specific, special, or actual malice is required to be shown that the Defendant specifically intended to cause the injury the Plaintiff sustained.

Thus, even assuming arguendo, that the Defendant was subjectively acting in good faith in his own mind, in that he was merely attempting to create sales to Middle East customers for automobiles by his the transporting of the vehicle to the Middle East, this would not operate a defense. The court is not required to find actual or specific malice in the sense that the Defendant intended the specific damage that resulted from his actions, only that he intentionally committed the acts themselves, and in willful disregard of the Plaintiff's contractual rights, and damages resulted. Other factors that have influenced the Court's decision is that there was no prior pattern or course of conduct between the parties as was found in Davis v. Aetna Finance, supra, as here the Plaintiff had not on previous occasions, either expressly or im-

pliedly, permitted the Defendant to cause the vehicle in question or any other leased vehicle to be shipped out of the United States. The lease in question and the lease for the other Auburn not in issue were the only lease transactions between the Plaintiff and Automotive. Thus, the Plaintiff had not by a pattern of prior conduct given the Defendant any justification or good cause to believe that the Plaintiff would not object to the shipment of the vehicle overseas. The lease term prohibiting the transportation of the vehicle outside of the United States was expressly inserted therein to protect the lessor from any damages that might arise from the very thing that did in fact occur in this case, i.e. that the vehicle would be unreasonably placed beyond the Plaintiff's ability to exercise dominion and control over the vehicle if the lease terms were breached, and which would also unreasonably expose the vehicle to risks of damage or loss not contemplated by domestic use, and which could not be reasonably prevented by the Plaintiff.

The Court finds that the transporting of the vehicle outside of the United States was "willful" in that it was done in knowing breach or willful disregard of the terms of the lease whether the Defendant actually read the lease or not, and that this conduct was "malicious" in that it had a great likelihood to cause direct and specific financial harm to the Plaintiff. The standard is not a purely subjective one of whether he had a specific intent to cause harm, but based on an objective standard that the Defendant should have reasonably known that his conversion could as a natural consequence thereof cause harm to the creditor.

Another factor to be considered is whether the Defendant continued to operate a business after the conversion, i.e. inquiry may be made into the post-conversion viability of the Defendant's business and his future prospects for generating income sufficient to pay the debt despite his conversion of the collateral. *In re Nelson,* 67 B.R. 498, n. 9. These factors are not present in this case.

In addition, whether the collateral was sold in the "ordinary course of business" pursuant to the agreement may be taken into consideration. Neither is this factor present in the case at bar.

Finally, the Plaintiff had instituted a replevin action in the state court versus Automotive and the Defendant on December 27, 1983 for default in the terms of the lease as to payment, after a formal demand therefore had been made in August of 1983, and after making numerous inquiries in an attempt to locate the whereabouts of the Defendant and the vehicle. The Defendant failed to advise the Plaintiff that the vehicle had been sent overseas and sold on March 4, 1983, immediately after this occurred so that the Plaintiff could take steps to protect its interest, and only after being faced with the threat of a replevin action in August of 1983, or some five months later, did the Defendant advise the Plaintiff as to the disposition of the vehicle.

Accordingly, the Defendant's conduct cannot be characterized as a simple breach of the lease agreement, and merely a technical conversion without malice. The Defendant intentionally and deliberately caused the vehicle to be transported overseas in clear derogation of the lease, at a time when the lease was in default. The court will not permit the Defendant to avoid liability here by permitting him to raise the defense that he did not actually know of the lease term prohibiting the overseas shipment of the vehicle because he did not read the lease when he had every opportunity to do so, and was a man of experience in business affairs. Thus, the first prong of § 523(a)(6) as to "willfulness" has been established by the Plaintiff. In addition, the Defendant being a businessman with a certain degree of commercial acumen, experience and sophistication, knew or reasonably should have known that placing the vehicle in the sole hands of an agent in the Middle East without any assurances that it would be safely returned to the United States unreasonably and clearly caused the Plaintiff's vehicle to be in jeopardy and subject to risk of loss. This was in willful disregard of the Plaintiff's rights under the lease and its owner-

ship interest in the leased vehicle. This is sufficient to establish the second prong of § 523(a)(6) as to implied or constructive malice as specific or actual malice or intent to cause injury is not necessary.

Thus, the Defendant's debt for conversion is held to be nondischargeable in bankruptcy under § 523(a)(6).

This being the case, the Court need not address the issue of whether the Defendant actually sold the vehicle himself or whether Hijris, as the Defendant's agent, sold the vehicle to a third party at the Defendant's express direction.

The final issue is the measure of damages to be assessed versus the Defendant.

■ A judgment obtained by a creditor in a dischargeability proceeding arising out of the conversion of a creditor's collateral (here the leased chattel) is limited to the market value of the collateral at the time it was converted. *Matter of Burdick*, 65 B.R. 105, *supra; In re Cline*, 52 B.R. 301 (Bankr.Ky.1985); *In re Tanner*, 17 B.R. 201 (Bankr.W.D.Ky.1982). Damages do not include the full balance due and owing under the agreement or any attorney's fees contemplated by the agreement in that the dischargeability action is not based on contract, but rather a federal statute sounding in tort. Remedies created by federal statute do not give rise to a right to attorney's fees unless the statute so provides. *In re Penney*, 76 B.R. 160 (Bankr.N.D.Cal.1987).

Damages for conversion are bounded by the balance due the creditor rather than the value of the collateral at the time and place of sale. Accordingly, where the balance due on the underlying agreement is less than the value of the converted chattel, the creditor will be limited to the balance due. *Matter of McCune*, 82 B.R. 510 (Bankr.W. D.Mo.1987). Thus, the amount of the debt to be held nondischargeable for a conversion in violation of § 523(a)(6) is the lesser of the value of the converted property or the amount of the indebtedness. *In re Gantt*, 56 B.R. 852 (Bankr.E.D.Va.1985).

■ In the case at bar the Plaintiff testified that the vehicle in question was acquired by it for $22,500.00, and that based

on its depreciation schedule the value thereof was approximately $19,157.00 on March 4, 1983, when the date the vehicle was apparently sold to Hijris. There is no evidence of any unusual depreciation relating to the vehicle whereby there was a decrease in the value thereof beyond that occasioned by normal wear and tear. The March 4, 1983 sale date was so close to the date of the initial conversion by the Defendant in late January of 1983, that the Court will fix the market value thereof on the date of conversion as $19,157.00.

The total amount of the lease payments over 36 months was $34,131.60. According to the post-trial affidavit filed by the Plaintiff on October 21, 1988, the total amount paid by the Defendant and/or Automotive on the lease was $8,131.74. Thus, the principal balance due on the lease, exclusive of any late charges, penalties or attorneys fees was approximately $25,999.86.

Although the Defendant himself asserted the value of the vehicle was around $45,-000.00, Shaver himself testified that the vehicle did not increase in value but did in fact depreciate as it was a replica rather than a true antique. Thus, the Court will fix damages to be assessed versus the Defendant as the market value of the vehicle at the time of conversion or $19,157.00. Inasmuch as the balance on the lease was $25,999.86, and this was in excess of the market value of the vehicle at the time of conversion, the principal amount recoverable from the Defendant shall be fixed at the lesser sum of $19,157.00.

In addition to the principal sum as set out above that is recoverable from the Defendant based upon willful and malicious conversion, prejudgment interest shall also be awarded. *In re Southern Indus. Banking Corp.*, 87 B.R. 518 (Bankr.E.D.Tenn. 1988), *citing Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); *Waite v. the Second National Bank*, 168 F.2d 984 (7th Cir.1948); *Larkin v. Welch*, 86 F.2d 442 (7th Cir.1936) (discussing prejudgment interest recoverable in preference actions).

As stated by the Court in the preference action case of *In re Fulghum Constr. Co.,* 78 B.R. 146 (M.D.Tenn.1987):

> The purpose of awarding interest is to compensate the wronged person for deprivation of the monetary value of the loss from the time of the loss to the payment of the money judgment. *Turner v. Japan Lines, Ltd.,* 702 F.2d 752 (9th Cir. 1983). Preference actions are not exempt from the imposition of prejudgment interest and there is a long history of judicial support for awards of prejudgment interest in preference actions. *E.g., Kaufman v. Tredway,* 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Foreman Industries, Inc. v. Broadway Sand & Gravel,* 59 B.R. 145, 155 (Bankr. S.D.Ohio 1986); 3 *Collier on Bankruptcy,* # 60.63[1], at 1129 (14th ed. 1977). Generally, interest should be paid from the time a demand was made for a return of the property, or, in the case where no demand was made, from the date the complaint was filed to the entry of the judgment. *E.g., Kaufman v. Tredway,* 195 U.S. at 273, 25 S.Ct. at 34; *Foreman Industries, Inc. v. Broadway Sand & Gravel,* 59 B.R. at 156.

*Id.* at 153.

Prejudgment interest in preference litigation accrues from the date of demand on the Defendant, or absent demand, from the date the adversary was filed. *In re Southern Industrial Banking Corp.,* 87 B.R. at 522, *supra.*

Historically, Indiana Courts have awarded interest in conversion cases based on the value of the goods converted from the time of conversion. *See e.g., Kavanaugh v. Taylor,* 2 Ind.App. 502, 28 N.E. 553 (1981). Although, this adversary is based on federal law, the Court holds that prejudgment interest should also be awarded based on the market value of the chattel converted from the time of conversion to fully compensate the Plaintiff for its loss.

What rate of interest should be applied in the case at bar? When a federal court judgment is based on a state law claim, the Court must look to state law to determine the propriety of prejudgment interest on

recovery. *The Travelers Insurance Company v. Transport Insurance Company,* 846 F.2d 1048 (7th Cir.1988). However, federal law governs postjudgment interest on a federal judgment. *Id.* If the issues to be resolved are a federal matter however, federal law shall apply as to prejudgment interest. The Court in *In re H.P. King,* 64 B.R. 487 (Bankr.E.D.N.C.1986) in discussing federally created preference actions stated as follows:

> Although many issues adjudicated in bankruptcy court concern rights arising under state law, the avoidance of a preferential transfer is not one of them. The source of a trustee's right to avoid a preferential transfer is section 547 of the United States Bankruptcy Code. Section 547 does not merely provide a mechanism for enforcing in bankruptcy court a right existing independently under state law; it creates the right. Because liability in a preferential transfer case arises from § 547, federal, not state law governs the determination of the appropriate rate of interest. *In re E.D. Presley Corp.,* 44 B.R. 781, 784 (Bankr.S.D.Fla.1984). *See also, In re Production Steel, Inc.,* 60 B.R. 4 (Bankr.M.D.Tenn.1986) (applying federal law); *Matter of Foreman Industries, Inc.,* 59 B.R. 145, 157 (Bankr.S.D. Ohio 1986) (applying federal law); *In re Demetralis,* 57 B.R. 278, 284 (Bankr.N. D.Ill.1986) (applying federal law).

*Id.* at 490.

Inasmuch as the judgment versus the Defendant herein is based on § 523(a)(6), a federally-created cause of action, the state prejudgment interest rate is not applicable. Although the same acts would also form the basis for a common law conversion action based on Indiana law if this were an action between the two parties in the state court or in the Federal District Court based solely on diversity and without the intervention of a bankruptcy proceeding. This judgment is based upon a federally created right under § 523(a)(6). Neither 28 U.S.C. § 1961 which establishes the *post* judgment interest rate nor any other federal statute sets forth the applicable guidelines concerning the award of *pre* judgment in-

terest in federal courts. *Id.* at 491. The determination of the interest rate has generally been left to the Court's discretion. *Id.* at 491, *citing Central Rivers Towing, Inc. v. City of Beardstown, Ill.,* 750 F.2d 565 (7th Cir.1984). In non-bankruptcy cases, federal courts have found that the rate for postjudgment interest in 28 U.S.C. § 1961 is also appropriate for prejudgment interest unless there is "substantial evidence" showing "that the equities of the particular case require a different rate." *Id.* at 491.

In *In re H.P. King Co., Inc., In re Southern Industrial Banking Corp.,* and *Matter of Foreman Industries, Inc.,* 59 B.R. 145 (Bankr.S.D.Ohio 1986) all preference cases, the Court awarded prejudgment interest at the postjudgment rate set forth in 28 U.S.C. § 1961. The Court agrees this is the proper pre-judgment interest rate to be applied as to this § 523(a)(6) adversary proceeding.

The prejudgment interest rate shall be equal to the coupon issue yield equivalent, as determined by the Secretary of the Treasury, of average accepted auction price for 52 week United States Treasury Bills settled immediately prior to the conversion of the chattel on or about February 1, 1984. At each anniversary of the conversion of the chattel thereafter, the interest rate shall be adjusted to reflect the new interest rate for 52 week Treasury Bills.

Of course, pursuant to 28 U.S.C. § 1961, the postjudgment interest rate shall be computed at a rate equal to the coupon issue yield of a 52 week Treasury Bill settled immediately before the date of judgment.

The Court takes judicial notice of Federal Reserve Statistical Release H.R. (519) dated December 19, 1988. The last released yield for a 52 week Treasury Bill is 8.49%. This shall be the postjudgment rate of interest. It is therefore,

ORDERED, ADJUDGED, AND DECREED, that the Plaintiff recover of the Defendant the principal sum of $19,157.00, together with prejudgment and post judgment interest, together with the costs of this adversary proceeding, pursuant to

§ 523(a)(6), and that this judgment shall not be dischargeable in the Defendant's general discharge pursuant to § 727.

The Clerk shall set forth this judgment on a separate document pursuant to Bankr.R. 9021.